**D. B., et al., Plaintiffs,**

v.

**Graham TEWKSBURY, Individually and in his official capacity as Director of the Columbia County Juvenile Department, et al., Defendants.**

**Civ. No. 80–817.**

United States District Court,
D. Oregon.

Aug. 6, 1982.

Susan M. Svetkey, Alan Baily, Julie H. McFarlane, Margaret J. Nightingale, Jeanne Gross, Juvenile Rights Project, Oregon Legal Services Corp., Portland, Or., David B. Hatton, Oregon Legal Services Corp., Oregon City, Or., David C. Howard, Adrienne E. Volenik, National Center for Youth Law, St. Louis, Mo., for plaintiffs.

John C. McLean, James C. Rhodes, Special Columbia County Counsel, Portland, Or., Jill Thompson, Columbia County Counsel, St. Helens, Or., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

FRYE, District Judge:

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiffs and members of plaintiffs' class are all children who are presently confined, or who are subject to confinement in the Columbia County Correctional Facility (CCCF), an adult jail, in St. Helens, Oregon. Plaintiffs challenge the constitutionality of defendants' actions in confining plaintiffs and members of their class in CCCF. Plaintiffs seek declaratory and injunctive relief.

The case was tried to the court on February 2–12, 1982. Plaintiffs were represented by Susan F. Svetkey and David B. Hatton. Defendants were represented by Jill Thompson, Columbia County Counsel, and John McLean and John C. Rhodes, Oregon Attorney General's Office.

The court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1343(3) and (4).

### SPECIAL FINDINGS OF FACT

The named plaintiffs are children, all of whom have been detained in CCCF. Plaintiffs and their next friend and next friend of the class, Susan F. Mandiberg, represent a class certified by the court as consisting of similarly situated children.

Defendant Graham Tewksbury is the Director of the Columbia County Juvenile Department. Defendants A. J. Ahlborn, Robert M. Hunt, and Marion Sahagian are commissioners of the Columbia County Board of Commissioners. Defendant Tom Tennant is the Sheriff of Columbia County. He is responsible for the general operation and supervision of the Sheriff's Department, including CCCF. Defendant Willard E. Jones is the corrections supervisor of CCCF. He is responsible for the general operation and supervision of CCCF and for carrying out the Sheriff's policies and procedures in CCCF. Defendant James D. Taylor is the assistant corrections supervisor of CCCF. Defendants James E. Cox, Dale Len Durant, Larry C. Knowles, and Dale R. Stubbs are corrections officers in CCCF.

In acting and/or failing to act and in maintaining the conditions in CCCF, defendants, and each of them, separately and in concert, have been and are acting under color of and pursuant to the statutes, ordinances, regulations, customs, and usages of the State of Oregon and in their capacities as heretofore stated. Children have been and continue to be detained in CCCF with the knowledge of all the defendants.

CCCF houses both adults and children in the same facility. Many adults are convicted prisoners serving time on sentences already imposed. All children held in CCCF are pretrial detainees, i.e., there has been no adjudication with regard to these children's acts, status, or behavior. They range in age from 12 to 18. Many of the children are "status offenders." Status offenders are children who, by virtue of their ages, are confined for being beyond parental control or running away from home. Of 101 children held at CCCF during a nine month period in 1980, 36 were held on status offense charges. The remaining children during this period were held for acts which, if they had been done by an adult, would constitute crimes. Sometimes children are placed in CCCF for shelter care: for example, a child who has been raped can be placed in CCCF.

Children do not stay in CCCF for long periods of time, but status offenders ordinarily are confined longer than those detained for criminal acts. In any event, 70 percent of the children who were confined in CCCF in 1981 were released within 24 hours. Nearly 75 percent of the children held in CCCF are released to their parents. A small number pose an immediate threat to community safety or their own safety or may flee from the court's jurisdiction. In 1980, of 124 children confined in CCCF, during a nine month period, only 25 required secure custody. The others could have been released without posing a serious threat to community safety, personal safety, or court jurisdiction.

CCCF is located on the ground floor of the Columbia County Courthouse in St. Helens, Oregon. It was built in 1962 and was altered in 1975. The offices of defendant Tewksbury and each of his three juvenile counselors are located in a building connected to the CCCF building.

Children detained in CCCF are usually placed in quarters consisting of multiple-occupancy cells with a common day space. They may be placed in isolation cells, however. Each multiple-occupancy cell contains steel bed frames, a toilet-sink installation, one overhead light, and a steel-barred wall with a sliding door. Children are locked inside the cells from 10 p. m. to 6 a. m.

The day room area, i.e., the common room, contains a metal picnic table, fluorescent lighting fixtures, and a single shower unit. There is no natural light in the cells occupied by children. Illumination is sufficient for overall visibility. All walls, floors, and ceilings are solid concrete or concrete block materials. The walls are painted blue.

Doors entering into these areas are either steel bars or solid metal. Each door contains a small viewing window and a food service slot. Children are detained in cells geared for as many as three children. Sometimes children ranging in age from 12 to 17 years are placed in the same cell.

Children held in CCCF are not issued sheets, mattress covers, or pillows. They sleep on mattresses covered with urethane and they are given a wool blanket. Occasionally children are not given mattresses. Those children placed in isolation cells sleep on cement floors.

Female children are not advised by matrons that sanitary napkins or tampons are available. If requested, however, they are made available. Matrons are not stationed within the secure detention area of CCCF. They are stationed in the front office area and are in the jail only to make checks on the female children. In order to obtain a sanitary napkin or tampon, female children must strike their cell doors or yell to attract the attention of a male corrections officer, who in turn contacts a matron. There are no full-time matrons available during night

shifts, but if a female child is detained during the night, a part-time matron is called and is available.

There is no 24-hour a day intake screening process at CCCF. The intake process at CCCF is essentially an *admissions* process rather than a *screening* process. Part of the reason that children are detained at CCCF rather than being placed elsewhere is that there are no written criteria upon which to make decisions regarding who should be detained in CCCF. There is no policy as to *who* makes a decision when a child is to be lodged in jail. There is a phone list for jail staff to use to try to reach juvenile counselors, but counselors are sometimes unavailable. Children are then lodged based upon the decision of the corrections officer (jailer). If an arresting officer can locate a juvenile counselor, there is nothing in writing that tells the officer or the juvenile counselor when to lodge the child. For example, D. P. was arrested with a friend. D. P.'s friend was released to his parents who came to pick him up. D. P., however, was lodged in CCCF because his custodial grandmother did not have a car and therefore could not pick him up. Even if a juvenile counselor is available, the juvenile counselor does not speak directly with the child before he or she makes an intake decision. There are no written procedures for how to handle physically, mentally, or emotionally handicapped children. Jail personnel testified that none of these children are ever detained.[1]

All clothing of children detained in CCCF is confiscated. Children are issued jail clothes which consist of jeans, a shirt, and socks for boys, and slacks, a blouse, and socks for girls. No child lodged in CCCF may have underwear.[2]

Toilet facilities at CCCF are not screened from view and children using these toilet facilities are visible to other children and to corrections officers. The day room area has a shower which can be used at all times when the children are not locked in their cells. On occasion showers in CCCF are not equipped with shower curtains. Children showering are visible to other children and to corrections officers. Female children using the toilet or shower are visible to male corrections officers. Male children using the toilet or shower are visible to matrons.

Children in CCCF are sometimes placed in either of two isolation cells.[3] These are 8′ × 8′ windowless concrete block rooms, barren of all furniture and furnishings. Sometimes it is very cold in the isolation cells. Near the center of the isolation cell there is a sewer hole which is the only facility for urination and defecation.

Lighting and the mechanism for flushing the sewer hole for each isolation cell are controlled outside the cell by the corrections staff. Lights in the isolation cells are sometimes left on or off for long periods of time. Sometimes the sewer hole is not flushed for long periods. When the mechanism for the sewer hole is flushed by a corrections staff officer, water and sewage gushes onto the cell floor.[4]

The isolation cells are located across a corridor from the adult male dormitory cell which holds up to 18 prisoners. For a child to be placed in isolation, that child must be moved down a corridor immediately outside the adult male dormitory cell. The child can see the adult male prisoners, and the adult male prisoners can see him or her.

1. Although the two new Columbia County Circuit Court Judges have taken steps to require that the court rather than counselors or jailers make detention choices, the procedure is still not in writing so as to be clearly articulated and understood.

2. For sanitary reasons personal clothing is confiscated from children and adult prisoners. Adults at CCCF can, however, have underwear brought to them, and children cannot.

3. The jailer and Juvenile Director contend the isolation cells are no longer in use. Word-of-mouth policy permits the use of isolation cells, however. There is nothing in writing that forbids the use of isolation cells.

4. This court in its tour of CCCF witnessed the water erupt several inches above the floor and splash on the cell floor around the sewer hole. A Columbia County Special Grand Jury recommended that the isolation cell not be used in its condition.

When the isolation cell door is closed, children in isolation and the adults in the dormitory cell can and do communicate by talking in loud voices.[5] Children may also encounter adult inmates during the intake process.

There are no written standards for placement of children in isolation. There is no one designated to determine if and when a child should be placed in isolation. There is no absolute limit to the period of time that a child can be held in isolation. Isolation cells have been used when children were intoxicated or under the influence of drugs. Children have also been placed in isolation for perceived offenses or disputes between children held in the same cell. There is no psychological screening of children placed in isolation. No log is maintained when a child is placed in isolation.

Meals served to children are planned, prepared, and served by corrections officers. Corrections officers must prepare meals in addition to performing their other duties.[6] Corrections officers are not trained in nutrition or food preparation. They are not supervised by a nutritionist or a dietitian. There are no written menus. Meals are prepared from foods available in storage. Food served to children is the same as that served to adult prisoners and to the corrections personnel themselves, except that children at CCCF are not allowed to buy food through the commissary, while adult prisoners are. Special dietary needs of children, or special dietary needs of a child such as a diabetic child are not considered.

No medical screening procedure is used for children admitted to CCCF other than a visual inspection by an untrained corrections officer. Children who are intoxicated or under the influence of drugs are admitted to CCCF. Corrections officers have no training in identifying or meeting the needs of intoxicated or drug dependent children. These children may be placed in isolation. For example, one of the plaintiffs, D. P.,

was arrested while intoxicated and was placed in isolation for uncooperative behavior. He received no counseling or assistance from anyone trained to deal with an intoxicated child. After shattering his finger and breaking out several teeth, he was transported to Dammasch Hospital.

K. K. was also detained at CCCF while intoxicated. Because of belligerent behavior, he was placed in a juvenile section in handcuffs. He received no medical screening, monitoring, or assistance, and was later found on his cell floor in a pool of vomit and urine. He was then taken to Columbia District Hospital where he was admitted for observation.

There is no daily sick call for children at CCCF. There is no regular program for a doctor or a registered nurse to visit the jail to identify or attend to the medical needs of children held in CCCF. Emergency medical equipment in the jail consists of a first aid kit and an oxygen tank.

Corrections officers determine whether a child needs medical treatment based upon perception, common sense, and experience. If a child believes he or she is ill, the child notifies a corrections officer, who decides whether the child should be taken to a doctor. There are no written criteria for corrections officers to follow in determining whether a child should see a doctor.

There are no special rules or procedures for the treatment of emotionally disturbed children who panic in a jail setting. There is no emergency medical health service. There are no psychiatrists, psychologists, or counselors on call. Frequently children in CCCF do not see their juvenile court counselors at all during their incarceration in the jail. There is no written log kept of juvenile court counselor visits to the jail.

There are no educational programs for children at CCCF. Children are not allowed to have books or magazines or pencils and paper. This policy is not the jail's

---

5. This court in its tour of CCCF entered an isolation cell and could hear and understand through the cell door a speaker standing in the corridor next to the adult dormitories.

6. A Columbia County Special Grand Jury found that officers did not always have time to prepare meals.

policy, but the policy of the Juvenile Department. Corrections officers have been instructed by the Juvenile Department not to give children reading material or pencils and paper. It is also the policy of the sheriff. C. H., a juvenile, was twice jailed for truancy. Jailers refused to give him any of his school books.

There are no recreational programs, materials, or activities for children at CCCF. Children have no access to televisions, radios, or any other recreational material, including books, magazines, and pencils and paper.

There are no facilities or equipment for exercise. There is no exercise room and there are no organized exercise classes or programs for children, although children may exercise in the cells or in the day room area.

Children are treated considerably differently from adults. Adults have access to books, television, radio, cards, and other recreational materials; children do not. Adults are allowed to have underwear brought to them at CCCF; children are not. Adults have regular visitation and may visit with friends as well as families; children have no regularly scheduled visitation. Adults are allowed to send and receive mail; children are not allowed to send or receive mail. Adults are provided paper, writing material, envelopes, and stamps. Children are not allowed to have paper, writing material, envelopes, or stamps. Adults are allowed to make one phone call upon admission; children are not allowed to make a phone call upon admission. Adults are allowed to make phone calls during their period of incarceration. Children at CCCF, prior to the court entering its preliminary injunction dated June 10, 1981, were prohibited from making phone calls without Juvenile Department permission. When an attorney comes to CCCF to see an adult inmate, this visitation is allowed. If an attorney comes to CCCF to see a child, the attorney must go through the Juvenile

Department to gain access to the child.[7] An inmate manual governs the conduct of adults held in CCCF. Children are not advised what behavior will result in disciplinary action or sanctions. There are no grievance procedures for children.

Parents are not allowed to visit children confined in CCCF without permission of the Juvenile Department. Jailers do not have the authority to allow parent-child visitation. Visitation with children in CCCF is controlled by the Juvenile Department and not the jail. The visitation policy for children is not in writing. There are no standards within the Juvenile Department for granting or denying visits with children in CCCF. No contact visits are allowed. Parents and detained children must talk to one another by means of a telephone and are separated by shatter-proof glass. Jailers sometimes will not tell inquiring parents whether or not their child is, in fact, in jail.

There are no formal written policies and procedures pertaining to the care and treatment of juveniles at CCCF. The policies that do exist are developed informally and handed down verbally. Therefore, many policies are in a constant state of flux and/or confusion. Furthermore, it is impossible to determine which policies are promulgated by the Juvenile Department and which policies are promulgated by the Sheriff's Department. There is no written contract between the Juvenile Department and the Sheriff's Department or jail regarding confinement of children.

There are no written rules governing the conduct of children held in CCCF. Therefore, children are not notified of what behavior is expected of them. What behavior is expected of them is left to the individual whims and caprices of the various corrections officers in charge. For example, it is up to an individual officer's discretion to decide if a child should be locked in isolation. It is up to an individual officer's discretion what restraining physical tactic to employ in dealing with a child.

---

**7.** An attorney appointed by a Juvenile Court Judge may have access to a child without permission of the Juvenile Department. All of the plaintiffs and presumably many of the class, had no appointed attorney while detained in CCCF.

All full-time corrections officers at CCCF are men. There are three part-time matrons who are employed to handle female children. Matrons are not stationed within the security detention area of CCCF. The part-time matrons are not required to receive training that male corrections officers receive. If a female child wants to get the attention of a matron, she first must get the attention of a male guard, who in turn contacts the matron. Ordinarily, female children are not informed by jail staff as to how to get the attention of a matron. Frequently only one corrections officer staffs the jail.[8]

Corrections officers at CCCF are basically jail staff. They have no training and little time to work with children. For example, if a child locked in a cell is screaming or yelling, the officer may go to the cell and yell, "Quiet down." The personnel at CCCF are not prepared or trained to treat children in other than a manner consistent with a maximum security lock-up facility.

Although there is no evidence to indicate physical abuse such as beatings, there is evidence that corrections personnel have made verbal threats toward detained children and have refused to tell them the time of day when requested. Since there is no natural light in the children's cells and since there are no clocks, children often become disoriented as to time.

Generally, the corrections staff has been insensitive to the needs of children in stressful situations. For example, when C. H. called for help when he and his brother were being harassed by older juveniles, the staff did not respond for a long time. One jailer told L. B. and other girls that they could bleed to death if they wanted to during an incident when the girls had broken a light bulb and were carving on their bodies. When D. B. called for help when he saw an adult inmate lying on the ground with slashed wrists, the corrections officer told him to "Shut up or go to the isolation cell."

When D. P. refused to sign a paper during the booking process, a corrections officer grabbed D. P. by the hair and used an arm lock to pull D. P. to his cell. One corrections officer threatened to put D. P. in a cell with a "buck nigger" and showed D. P. a bloody shirt which the officer claimed indicated what happened to the last person who shared a cell with a "buck nigger."

Children in CCCF are allowed to see and hear adult inmates.[9] All entry ways, passages, and exits to and from the facility are the same for juveniles and adults. Children in both isolation and regular cells can and do communicate with adult inmates. Several of the plaintiffs have been subjected to sexually suggestive comments from adults. Corrections officers do not invite child-adult communication; however, they cannot prevent it.

In January, 1980, the Columbia County Circuit Judge appointed a special investigating Grand Jury to make a complete investigation into the conditions at CCCF. That Grand Jury inspected the jail and took testimony. In May, 1980, the Grand Jury found numerous deficiencies in the facility and specifically recommended that children not be kept in CCCF until these conditions were remedied. The Grand Jury further expressed "hope" that alternatives to confinement of children in CCCF would be developed.

After the Federal Defender for the District of Oregon investigated conditions in CCCF, the United States Marshals Service discontinued placement of federal prisoners in CCCF.

Columbia County has some cost-effective alternative facilities for housing children. Shelter care is available. Defendants agree that removal of children from CCCF could result in a potential financial saving to Columbia County. Facilities in Cowlitz County, Washington, and at the Multnomah

8. The Columbia County Special Grand Jury found that the jail is inadequately staffed, and therefore inmates do not receive proper care.

9. Although CCCF is in violation of the screening provisions of ORS 419.575, ORS 169.079 (1979) (amended 1981; renumbered ORS 169.-740), statutory violations at CCCF will not be addressed in this opinion.

County Juvenile Detention Facilities, in Portland, Oregon are available. Columbia County participates in the Juvenile Services Act and in the 1981–82 biennium received approximately $100,000 under that act. Columbia County has been negotiating for and could receive funds in the amount of $36,-000 under the Boys and Girls Aid Jail Removal Initiative Proposal. Columbia County has a special fund of approximately $25,-000 given as a bequest for the betterment of conditions for children.

Data from a contiguous county, Clackamas County, indicate that children requiring secure custody in Clackamas County are housed in Multnomah County's Juvenile Detention Facility and that this program does not cost Clackamas County any more money than putting children into jails. Columbia County can request free technical assistance through the Federal Office of Juvenile Justice and Delinquency Prevention. At no cost to Columbia County, procedures, practices, programs, and planning can be provided so that Columbia County has access to expertise and planning and monitoring skills of experts in the field of juvenile care. It would take approximately 30 days to effect a 100% removal of children from CCCF and set up alternatives.

Current literature in the field of juvenile justice indicates that behavior modification of socially-deviant children is best achieved when children are diverted from the criminal justice system and its jails and punishments whenever possible. Studies also indicate that whenever restraints of children are necessary for the protection of society or protection of the children themselves, these restraints are best carried out through diversion programs, home detention, shelter care, crisis or emergency centers, or through intensive counselling and monitoring. As a last resort, the literature indicates, children who need to be confined should be held—not in jails or dungeons—but in juvenile detention centers geared to meet the needs of these children.

The jailing of children in maximum security adult jails such as CCCF stigmatizes (or brands) them as criminals. This inter-feres with their relationships with their families, schools, and communities—and most of all with their ability to confront adolescent crises and emerge from those crises as *law-abiding* productive adults. It increases the chance that they will forever be "criminals." The fact that the confinement is brief does not reduce the harm.

The plaintiffs were credible witnesses. Details of their stories were corroborated by the testimony of defendants, themselves, the Columbia County Grand Jury report, the Federal Defender's report, the CCCF jail records (and absence of records), and the expert witnesses.

Defendant Tewksbury has publicly described CCCF as "pretty much a bare lock-up, just like the adult jail, but the kids don't get the same privileges ... It's a boring place, a helluva place." He has further stated "Detention is punishment and I try to make it as unappetizing as possible. The last place a child wants to be."

## GENERAL FACTUAL FINDINGS

CCCF is designed for the purpose of confinement, without regard for human dignity or need. Nothing over and above the basic minimums necessary for the maintenance of bodily functions is provided to children at CCCF. Nothing at CCCF is responsive to the emotional and physical needs of children in conflict with the law and their families. CCCF is a maximum security lock-up facility.

Placement of children within cells without regard to their ages or levels of maturity and without adequate supervision by trained corrections staff and without regard to the reasons why they are being held, increases antisocial behavior such as violence and physical abuse.

To require a female child to strike a cell door or to yell for assistance in order to receive sanitary napkins causes needless embarrassment and humiliation to such child. To require any child to go without underwear in a culture in which underwear is considered a requirement of dress causes needless embarrassment and humiliation for the child.

The requirement that children wear jail "uniforms," and the lack of privacy for the use of showers and bathrooms contribute to feelings of anxiety and loss of self-esteem which are counterproductive to the goals of the juvenile justice system. The failure to provide counseling or psychiatric care for children in CCCF is also counterproductive to these goals.

The lack of programs and the method of "treatment" reflect policies of the Juvenile Department and the institution, rather than inadequate resources. These policies result in harsher treatment for pretrial detainee children than for adult prisoners, many of whom have been convicted and sentenced. The denial of access to family and friends by way of regularly scheduled visits, use of telephone, and use of mail, needlessly creates or intensifies children's fears, hostilities, and rages, and is, again, counterproductive to the goals of the juvenile justice system.

The failure to have a written policy results in confusion, arbitrary decisions, and different treatment under similar situations. Without written rules children are at the mercy of the corrections staff and therefore subject to unnecessary anxieties about what to do or expect. There is nothing for children to do while confined at CCCF. This creates needless idleness, boredom, acute anxiety, fear, depression, and hostility. Idle, unattended, confined children present special supervisory problems. They frequently become destructive and cause physical harm to each other, themselves, or to their surroundings.

CCCF is inadequately staffed and the staff is inadequately trained to handle children. As a result, there is a lack of proper care of children. Jailers without special training in dealing with children under stress or emotionally distressed children are not qualified to provide the kind of counseling and therapy which is consistent with the goals of the juvenile justice system.

Confinement in CCCF is clearly and fundamentally intended to punish children. Punishment is the treatment of choice of Columbia County's Juvenile Department for its detained children. This "treatment" has little or nothing to do with simple detention, rehabilitation, or even the protection of society.

## CONTENTIONS OF THE PARTIES

Plaintiffs contend *inter alia* that the conditions and restrictions imposed on plaintiffs and plaintiffs' class by defendants constitute punishment and thereby violate plaintiffs' rights as pretrial detainees not to be punished under the due process clause of the 14th Amendment to the United States Constitution.

Plaintiffs seek (1) a declaration that their federal constitutional rights have been violated, and (2) a permanent injunction enjoining defendants from confining plaintiffs and members of their class in CCCF or any other adult correctional facility. Plaintiffs request an award of attorney fees and costs, and any other relief that the court deems just and proper.

Defendants contend that they have acted pursuant to Oregon statutory provisions and that the Oregon statutory provisions pertaining to the detention of juveniles do not violate the United States Constitution.

This case requires the court to examine the federal due process rights of children detained prior to a hearing or adjudication in CCCF, an adult maximum security correctional facility.

## CONFINEMENT IN CCCF AS PUNISHMENT

Oregon statutory law allows a child to be detained in local correctional facilities such as CCCF so long as the portion of the facility holding the child is screened from the sight and sound of adult prisoners. ORS 419.575, ORS 169.079 (1979) (amended 1981; renumbered ORS 169.740). Under Oregon law, then, plaintiffs may legitimately be incarcerated in CCCF prior to an adjudication of their status or guilt. It is the scope of their federal constitutional rights during this period of confinement before a hearing that is the focus of this case.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a pretrial detainee not be punished. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). A state does not acquire the power to punish a person—adult or child (assuming a child is convicted of committing a crime)—until after it has secured a formal adjudication of guilt in accordance with due process of law. Not every disability imposed in preadjudication detention amounts to "punishment," however. The very fact of detention implies a measure of restriction of movement, choice, privacy, and comfort.

This court must determine whether the conditions imposed upon plaintiffs are imposed for the purpose of punishment or whether they are incidents of some other legitimate governmental purpose. In this case the determination is simple. Defendant Tewksbury has stated publicly and expressly that he intends to punish children detained in CCCF. It is the express intent of defendants that plaintiffs' confinements in CCCF be punishments. The intent to punish is carried out in the extraordinary conditions of confinement imposed on plaintiffs while confined in CCCF. Confinement of child pretrial detainees in CCCF as it now exists is punishment prior to an adjudication of guilt.

Defendants have violated plaintiffs' due process rights under the Fourteenth Amendment to be free from pretrial punishments by confining plaintiffs in CCCF. Those extraordinary conditions which alone and in combination constitute punishment are:

1. Failure to provide *any* form of work, exercise, education, recreation, or recreational materials.

2. Failure to provide minimal privacy when showering, using toilets, or maintaining feminine hygiene.

3. Placement of intoxicated or drugged children in isolation cells without supervision or medical attention.

4. Placement of younger children in isolation cells as a means of protecting them from older children.

5. Failure to provide adequate staff supervision to protect children from harming themselves and/or other children.

6. Failure to allow contact between children and their families.

7. Failure to provide an adequate diet.

8. Failure to train staff to be able to meet the psychological needs of confined children.

9. Failure to provide written institutional rules, sanctions for violation of those rules, and a grievance procedure.

10. Failure to provide adequate medical care.

## CONFINEMENT IN JAILS AS PUNISHMENT FOR STATUS OFFENDERS

Plaintiffs also contend and ask the court to rule that even if the conditions of confinement at CCCF are corrected, plaintiffs and plaintiffs' class may not be detained in CCCF because the confinement of plaintiffs and plaintiffs' class in *any* adult jail constitutes punishment *per se* and is therefore unconstitutional. The court will address this contention first as it relates to status offenders, i.e., runaway children or children who are out of parental control.

The impact that a runaway child or a child out of the control of his or her parents has on the family and may have on the community causes alarm and often leads to the necessity for societal intervention. The runaway or out-of-control child can jeopardize the lives and property of other people as well as his own life. The question is: Does the *status* of such a child justify placing that child in a jail?

Society has historically used terror, confinement, and punishment as a means of dealing with "status." For example, insane people used to be beaten and imprisoned. Lepers were sent to remote and undesirable geographical areas. As recently as 1962 the legislature of the State of California enacted a law which made *being* a narcotic addict a crime for which punishment could be

inflicted. That law was ruled unconstitutional by the United States Supreme Court. *Robinson v. State of California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

■ A child who has run away from home or is out of parental control is clearly a child in distress, a child in conflict with his family and his society. But nobody contends he is a criminal. A runaway child or a child out of control, as an addict or an insane person, may be confined for treatment or for the protection of society, but to put such a child in a jail—any jail—with its criminal stigma—constitutes punishment and is a violation of that child's due process rights under the Fourteenth Amendment to the United States Constitution. No child who is a *status* offender may be lodged constitutionally in an adult jail.

### CONFINEMENT IN JAILS FOR CHILDREN ACCUSED OF COMMITTING CRIMES

The court must now turn to the issue of whether it is constitutionally permissible to lodge children who have been accused of committing crimes in adult jails pending adjudication of the charges against them. The court has above ruled that confining children in CCCF pending adjudication of crimes or status constitutes punishment, and the court has further ruled that detaining children in *any* jails on the basis of their status or condition constitutes punishment and is an unconstitutional deprivation of due process. The court must now deal with children charged with committing crimes and must suppose that the jails in which these children are lodged are modern, "enlightened" kinds of jails—ones which provide different methods of discipline, care, and treatment appropriate for individual children according to age, personality, and mental and physical condition. The court must further suppose that these jails are

adequately staffed and provide reasonable measures of comfort, privacy, medical care, food, and recreation. Would it be constitutionally permissible to lodge children accused of committing crimes in these jails?

In deciding this issue, the court declines to rule on the "punishment" aspect of the due process clause of the 14th Amendment. Instead the court will rely on the "fundamental fairness" doctrine enunciated in *In Re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) and juvenile cases decided after the *Gault* decision.

■ Due process—or fundamental fairness—does not guarantee to children all the rights in the adjudication process which are constitutionally assured to adults accused of committing crimes. For example, children are not entitled to a jury trial, to indictment by Grand Jury, or to bail. In lieu of these constitutional rights, children are not to be treated or considered as criminals. An adjudication of a child as guilty does not have the effect of a conviction nor is such child deemed a criminal. Even upon a finding of "guilt" as to the criminal charges, the child may not be imprisoned in adult jails as punishment for his acts. ORS 419.507, 419.509.

■ Juvenile proceedings, in the State of Oregon as elsewhere, are in the nature of a guardianship imposed by the state as *parens patriae* to provide the care and guidance that under normal circumstances would be furnished by the natural parents.[10] It is, then, fundamentally fair—constitutional—to deny children charged with crimes rights available to adults charged with crimes if that denial is offset by a special solicitude designed for children.

■ But when the denial of constitutional rights for children is not offset by a "special solicitude" but by lodging them in adult jails, it is fundamentally unfair[11]

10. ORS 419.474(2) provides that juvenile court proceedings ". . . shall be liberally construed to the end that a child coming within the jurisdiction of the court may receive such care, guidance and control, preferably within his own home, as will lead to the child's welfare and the

best interests of the public, and that when a child is removed from the control of his parents the court may secure for him care that best meets the needs of the child."

11. This opinion does not apply to children who

When children who are found *guilty* of committing criminal acts cannot be placed in adult jails, it is fundamentally unfair to lodge children *accused* of committing criminal acts in adult jails.

In 1966 the United States Supreme Court envisioned the problem confronting this court:

> "... There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children."

*Kent v. United States*, 383 U.S. 541, 556, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966).

The supervisors at jails are guards—not guardians. Jails hold convicted criminals and adults charged with crimes. Jails are prisons, with social stigmas. Children identify with their surroundings. They may readily perceive themselves as criminals, for who goes to jail except for criminals? A jail is not a place where a truly concerned natural parent would lodge his or her child for care and guidance. A jail is not a place where the state can constitutionally lodge its children under the guise of *parens patriae*.

To lodge a child in an adult jail pending adjudication of criminal charges against that child is a violation of that child's due process rights under the Fourteenth Amendment to the United States Constitution.

### CONCLUSION

Plaintiffs are entitled to a permanent injunction and to reasonable attorneys' fees including reasonable attorneys' fees for the hearing on the motion for preliminary injunction. Plaintiffs' counsel shall submit to the court a proposed judgment order disposing of this case. Plaintiffs' counsel shall at the same time file their claims for attorneys' fees with supporting data and a memorandum. Defendants' counsel shall have

are remanded to adult criminal courts and who are afforded all of the constitutional rights accorded to adults charged with crimes. This

20 days to object to the form of the judgment and to request a hearing on the amount of the attorneys' fees. If the court receives no objection or request for hearing, it will sign the judgment order and will allow such attorneys' fees as it deems reasonable in accordance with law.

opinion also does not apply to children temporarily detained in police stations pending the obtaining of identifying information.