John DOE, Plaintiff,

v.

Gerald T. McFAUL, et al., Defendants.

John DOE, et al., Plaintiffs,

v.

Gerald T. McFAUL, et al., Defendants.

Civ. A. Nos. C82–2985, C82–3605.

United States District Court,
D.Ohio, E.D.

Dec. 26, 1984.

Jerome Emoff, Mary Ann O. Rini, Shaker Heights, Ohio, Thomas E. Frye, Euclid, Ohio, for plaintiff.

Richard Hoenigman, Patrick Murphy, Asst. Prosecutors, Cuyahoga County, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

These civil rights and tort actions[1] challenge the incarceration of juvenile offenders in an adult corrections facility by a state juvenile court judge as a violation of state statutes and the Eighth and Fourteenth Amendments to the Constitution. During their imprisonment both juveniles were assaulted and allegedly raped. In cross-motions for summary judgment, the plaintiffs seek a determination of liability against the government entities and officials who allegedly implemented the incarceration and permitted the assaults, while the defendants eschew responsibility for plaintiffs' injuries.

## I. ALLEGATIONS OF THE COMPLAINTS

The plaintiffs in both actions proceed under pseudonyms. In No. C82–2985 (*"John Doe I"*), the amended complaint states claims against Gerald T. McFaul, the Sheriff of Cuyahoga County ("the County"); Walter W. Brown, the Warden of the Cuyahoga County Corrections Center ("Corrections Center" or "the jail"); the County; the three County Commissioners at the time the cause of action arose, Edward Feighan, Vincent Campanella, and Virgil Brown ("the Commissioners"); Judge Leo M. Spellacy, the administrative judge of the Court of Common Pleas; various unnamed corrections officers; one named officer, James McTigue; and Tyrone Sweeney and Joel Williams, who were also inmates at the Corrections Center. In No. C82–3605 (*"John Doe II"*), the amended complaint names as defendants McFaul; Brown; ten named corrections officers; Judge Spellacy; the Commissioners; four Corrections Center inmates; the County; and Robert Pace, who was chief of security and later director of corrections at the Corrections Center.

The amended complaints in the two cases are essentially identical. Both actions are commenced pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, to redress alleged violations of the First, Fourth, Sixth, Eighth and Fourteenth Amendments to the Constitution and the Juvenile Justice and Delinquency Prevention Act ("JJDPA"), 42 U.S.C. §§ 5601–5751. Pendent state claims allege violations of Article I of the Ohio Constitution, the Ohio Juvenile Code, Ohio Rev. Code § 2151.01 *et seq.*, and Ohio common law. Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4).

Both plaintiffs allege that at the time the causes of action arose they were seventeen years old, were under the jurisdiction of the Juvenile Court, and had been found delinquent for violations of the Ohio Revised Code. Both claim that they were confined at the Corrections Center pending final disposition and sentencing, and were assaulted by other prisoners while corrections officers were away from their posts. John Doe I alleges that he was homosexually raped; John Doe II originally alleged attempted homosexual rape, but in a supplemental affidavit now claims that he was raped.

Count 1 of each amended complaint alleges that all defendants had "constructive or actual knowledge of the danger of as-

---

1. An order of November 7, 1984 consolidated pretrial proceedings in these cases pursuant to Fed.R.Civ.P. 42(a).

sault and rape to any juvenile due to the physical layout of the cell/pod area, the inadequate supervisory staff, and the commingling with adult offenders," and that the "conditions under which all juveniles are housed constitutes a pattern, practice, and custom of all defendants. "Count 2 states that confinement of juveniles at the Corrections Center violated the JJDPA, 42 U.S.C. § 5633(12), and Ohio Rev.Code § 2151.01, and deprived them of due process. Count 3 claims that the confinement constituted cruel and unusual punishment as prohibited by the Eighth and Fourteenth Amendments. Count 4 terms the confinement a violation of § 1983. Count 5 repeats the previous allegations that due process and § 1983 were violated and adds a claim of "false imprisonment," presumably as a pendent state claim. Count 6 alleges that the defendants' conduct constituted intentional infliction of emotional distress. Count 7 claims that the confinement of juveniles at the Corrections Center breached defendants' duty to protect juveniles in state custody and caused physical and emotional injury. Count 8 is directed solely against the other inmates and charges them with assault. The prayer for relief seeks compensatory and punitive damages, declaratory relief, costs and attorney's fees pursuant to 42 U.S.C. § 1988.

Defaults have been entered against the inmates, who are not parties to the pending motions.

## II. FACTS

In assessing the cross-motions for summary judgment, Fed.R.Civ.P. 56(c) requires that summary judgment may be entered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372 (6th Cir.1984).

### A. Statutory Scheme of the Corrections Center

Cuyahoga County is a subdivision of the State of Ohio established under Article X of the Ohio Constitution. The board of three county commissioners manages the County's affairs. The Commissioners possess the power to establish "a department of detention and correction." Ohio Rev. Code § 302.13(A). The Commissioners supervise the financial affairs of the Sheriff, *Id.* §§ 305.19, 305.20, and "[e]ach county commissioner shall visit, unannounced, at least once in every six months, each ... house of detention, ... and note its sanitary condition and the condition and treatment of inmates ..." *Id.* § 307.62. The Cuyahoga County Commissioners have established two detention facilities: the Corrections Center, where adults and juveniles who are remanded ("bound over") to the Court of Common Pleas for prosecution as adults are incarcerated, and a juvenile Detention Home, which provides care for individuals under the age of eighteen in conformity with the Juvenile Code. Feighan, Brown, and Campanella were Commissioners at all times pertinent to these actions.

Once they establish detention facilities, the Commissioners are obligated to provide heat, fuel, food, and other fixtures and supplies. *Id.* § 341.19. Day-to-day management of the jail and its inmates rests with the Sheriff, who "shall keep such persons safely, attend to the jail, and govern and regulate the jail according to the rules and regulations proscribed by the court of common pleas." *Id.* § 341.01. The Sheriff must prepare an annual report about the jail and must visit it monthly. *Id.* §§ 341.-03, 341.04. He may appoint one of his deputies as the "keeper." *Id.* § 341.06. McFaul was the Sheriff at the time of the incarcerations of John Doe I and John Doe II. Pace was chief of security when Doe I was at the jail and director of corrections while Doe II was there. Brown was warden at all pertinent times. McFaul and his top assistants issue orders to corrections personnel through Policy and Procedure Directives. Individual corrections officers

are required to be familiar with the Sheriff's directives.

Under § 341.06, "the court of common pleas shall prescribe rules for the regulation and government of county jail ..." The judges are to forward such rules to the Sheriff, *Id.* § 341.07, and may alter or amend them, *Id.* § 341.08. Consistent with this authority, the Court of Common Pleas for Cuyahoga County entered a Journal Entry in May of 1976, adopting "Rules for the Regulation of the Cuyahoga County Jail." The rules were promulgated in the name of all the local common pleas judges and the journal entry was signed by twenty-one of them. The cover of the rules mentions Judge Spellacy as presiding judge, since under the court's Rule 2 "[t]he administrative judge shall be the presiding officer of his division and shall have full responsibility for and control over the administration, docket and calendar of the division which he serves."

### B. *Statutory Scheme Concerning Juvenile Offenders*

The state and federal governments, the Court of Common Pleas, the Juvenile Court, and the Sheriff have laid down specific rules concerning the incarceration of juvenile offenders.

Ohio Rev.Code ch. 2151 governs juvenile courts and juvenile justice. The introductory provision, § 2151.01, states that the chapter

... shall be ... construed so as to effectuate the following purposes:

(A) To provide for the care, protection, and mental and physical development of children ...,

(B) To protect the public interest in removing the consequences of criminal behavior and the taint of criminality from children committing criminal acts and to substitute therefor a program of supervision, care, and rehabilitation;

(C) To achieve the following purposes, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interest of public safety;

(D) To provide judicial procedures through which Chapter 2151 of the Revised Code is executed and enforced, and in which the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced.

Section 2151.312 governs the place of detention of juveniles. During 1981, at the time John Doe I was incarcerated, it provided in pertinent part:

(A) A child alleged to be delinquent, unruly, or a juvenile traffic offender may be detained only in the following places:

(1) A certified foster home or a home approved by the court;

(2) A facility operated by a certified child welfare agency;

(3) A detention home or center for delinquent children which is under the direction or supervision of the court or other authority or of a private agency and approved by the court;

(4) Any other suitable place designated by the court.

A child may be detained in jail or other facility for detention of adults only if the facility in Division (A)(3) of this section is not available and the detention is in a room separate and removed from adults if public safety and protection reasonably require such detention. The court may order that a child over the age of 15 years be detained in a jail in a room separate and removed from adults if public safety and protection reasonably require such detention.

(B) A child alleged to be neglected, abused, or dependent shall not be detained in a jail or other facility intended or used for the detention of adults charged with criminal offenses or of children alleged to be delinquent unless upon order of the court.

The amended version, which became effective in November of 1981 and was in effect during the confinement of John Doe II, is substantially identical except that subsection (B) is now subsection (C).

Other federal and state statutes and rules impose similar requirements. As a participant in the JJDPA, Ohio is subject to

42 U.S.C. § 5633(12)(A), which conditions federal funding upon "submission of the initial plan that juveniles who are charged with or who have committed offenses that would not be criminal if committed by an adult or offenses which do not constitute violations of valid court orders ... shall not be placed in secure detention facilities or secure correctional facilities ..."[2] Section II-A-4-c of the rules promulgated by the Cuyahoga County Court of Common Pleas states: "No juvenile confined in the jail shall be placed or allowed to remain in the same modular unit with any adult inmate; and, so far as practicable, such juvenile shall be kept from associating with adult inmates." Juvenile Court Rule 7 provides that "[a] child may be detained in jail or other facility for detention of adults only if the child is alleged to be delinquent, there is no detention center for delinquent children under the supervision of the court or other agency approved by the court, and the detention is in a room separate and removed from those for adults." And the Sheriff's Policy and Procedure Directive 1.18.01, issued on May 17, 1977, states: "Juveniles confined in the Center *shall not* be placed or allowed to remain in the same modular unit with any adult inmate. As far as practical, juveniles shall be kept from associating with any adult inmate."

### C. The "Scared Straight" Program

Judge Leodis Harris of the Cuyahoga County Juvenile Court[3] testified in a deposition that in the late 1970's, after watching a television movie entitled "Scared Straight", he and his staff contacted the Sheriff's office to make arrangements for juvenile offenders under his jurisdiction to spend time at the old County Jail on East 22nd Street in Cleveland. Judge Harris stated that he did not consult psychologists or sociologists, the makers of the film, other Juvenile Court judges, Judge Spellacy, or the Commissioners prior to initiating the program. At first, juveniles spent only a

few hours at the County Jail, and one spent the night there. After the opening of the new Corrections Center in the Justice Center on Ontario Street—where Doe I and Doe II were incarcerated—Judge Harris began sending juveniles to the adult jail for days rather than hours at a time. All of the individuals in the program were juvenile offenders who remained under the jurisdiction of the Juvenile Court, were not remanded to the Court of Common Pleas for prosecution as adults, and were sent to the jail specifically to participate in "Scared Straight" and not because Judge Harris made any finding that the Juvenile Home was unable to accept the juvenile. The judge only sent juveniles to the Corrections Center after an adjudication, but he maintained no formal, written guidelines governing the program. Instead he simply made a subjective determination based upon "the totality of the circumstances."

Judge Harris estimated that as many as 250 juveniles—some as young as thirteen years old—went through the "Scared Straight" program. At no time did he make any special arrangements with the jail for handling the juveniles. In 1980, defendant Pace informed the judge that the Corrections Center did not have adequate programs to care for juvenile guests. It also appears that prior to 1981 at least one juvenile was raped and others were threatened. Judge Harris did not conduct any formal follow-up study to determine the effect of the program. He did express his informal conclusion that many juveniles who were sent to the jail were dissuaded from pursuing a life of crime, and that at least one has become a "model citizen."

Judge Harris has discontinued the "Scared Straight" program.

### D. The Plaintiffs

#### 1. John Doe I

Doe I was adjudicated delinquent by the Juvenile Court on charges of breaking and

---

**2.** Under 42 U.S.C. § 5633(14), the state plans need only "provide that, *beginning after the 5-year period following December 8, 1980,* no juvenile shall be detained or confined in any jail or lockup for adults..." (Emphasis added). The parties have not indicated whether Ohio is covered by this extension provision.

**3.** Judge Harris issued the orders incarcerating Doe I and Doe II but is not a party to either of these cases.

entering. He was seventeen years old at the time. On April 8, 1981, Judge Harris remanded him to the Corrections Center but retained full jurisdiction over the case and did not remand him for trial as an adult pursuant to Ohio Rev.Code § 2151.26. The court made no finding that space at the Detention Home was unavailable and no finding that public safety and protection mandated incarceration of Doe I at the adult facility. It also did not sentence Doe I to a specific period of incarceration.

Doe I was housed in Pod 3 on the third floor of the Corrections Center. Eleven other individuals occupied the pod. It is disputed whether all of the other individuals in the pod met the statutory definition of juvenile; however, it was the Sheriff's policy to keep juveniles separate from adults, and the plaintiffs have not demonstrated that any of the other prisoners were not juveniles under Ohio law. But at least some, if not all, of the juveniles were "bind-overs" held at the Corrections Center pursuant to the jurisdiction of the Court of Common Pleas.

On April 10, 1981, one of the other juvenile inmates in the pod sought to engage in sexual activity with Doe I. Doe I performed an oral sex act on the other inmate. Whether the act was voluntary, or a homosexual rape, and how many juvenile inmates were involved, are disputed questions of fact. Doe I alleges that defendants Sweeney and Williams raped him. Sweeney was being held in the pod awaiting transport to prison after pleading guilty to manslaughter. Williams was incarcerated at the Corrections Center following a Juvenile Court determination that he was a severe escape risk if sent to the Detention Home.

After the incident, Doe I was removed from the pod, treated at the medical unit and placed in an individual cell. On the next business day, he was returned to Juvenile Court. Doe I was eventually placed on probation.

### 2. John Doe II

Doe II was also seventeen at the time of his incarceration. The Juvenile Court found him delinquent on a theft complaint. Doe II was a repeat juvenile offender. Like Doe I, Doe II was not "bound over" to be tried as an adult, and Judge Harris made no formal finding that the Detention Home was overcrowded or lacked adequate programs to handle him. Nor did he rule that public safety required Doe's incarceration in the Corrections Center. On May 18, 1982, the Juvenile Court placed him in the custody of the Corrections Center.

Doe II was placed in Pod 6, another area set aside specifically for juveniles. The following evening, May 19, 1982, Doe II was apparently assaulted by other juveniles housed in the same pod, all of whom had been bound over to the Corrections Center for handling as adult offenders.[4] Again, whether Doe II was homosexually raped is a disputed question of fact. After the attack, Doe II was removed from the pod and kept in the medical ward overnight. He returned to Juvenile Court the following morning and was placed on probation.

Both Doe I and Doe II were accepted into the Corrections Center by the Sheriff as participants in the "Scared Straight" program. In neither case did the Juvenile Court transmit to the jailer the juveniles' social and family history, medical and psychological records, and complete delinquency history. Both were processed at the fourth floor booking area and were commingled with adults at the time of booking, fingerprinting, photographing, searching, visitation, hall transfers and medical care.

### III. JUVENILE INCARCERATION: FEDERAL CONSTITUTIONAL AND STATUTORY CLAIMS

Judge Harris' orders committing the plaintiffs to the Corrections Center violated the Ohio Revised Code and the Common Pleas and Juvenile Court rules. For pur-

---

**4.** The complaint alleges that the assault was performed by the defendants Turner, Smith, Gilbert and Taylor.

poses of plaintiffs' federal civil rights claims, the pertinent issue is what constitutional and statutory rights were violated by the incarceration.

Title 42 U.S.C. § 1983 provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

While the complaints invoke numerous constitutional provisions, plaintiffs' motion focuses solely on due process, equal protection, and cruel and unusual punishment claims under the Eighth and Fourteenth Amendments.

### A. *Due Process*

The Supreme Court has repeatedly held that the Due Process Clause is applicable in juvenile proceedings. *In re Gault*, 387 U.S. 1, 13–14, 87 S.Ct. 1428, 1436–37, 18 L.Ed.2d 527 (1967). "[T]he admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness." *Kent v. United States*, 383 U.S. 541, 555, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966). The Court has imposed these requirements while striving to retain some of the unique characteristics of the juvenile court system:

... We have held that certain basic constitutional protections enjoyed by adults accused of crimes also apply to juveniles. See *In re Gault, supra*, [387 U.S.] at 31–57 [87 S.Ct. at 1445–56] ... (notice of charges, right to counsel, privilege against self-incrimination, right to confrontation and cross-examination); *In re Winship*, 397 U.S. 358 [90 S.Ct. 1068, 25 L.Ed.2d 368] ... (1970) (proof beyond a reasonable doubt); *Breed v. Jones*, 421 U.S. 519 [95 S.Ct. 1779, 44 L.Ed.2d 346] ... (1975) (double jeopardy). But the Constitution does not mandate elimination of all differences in the treatment of juveniles. See, *e.g., McKeiver v. Penn-*sylvania, 403 U.S. 528 [91 S.Ct. 1976, 29 L.Ed.2d 647] ... (1971) (no right to jury trial). The State has "a *parens patriae* interest in preserving and promoting the welfare of the child," *Santosky v. Kramer*, 455 U.S. 745, 766 [102 S.Ct. 1388, 1401, 71 L.Ed.2d 599] ... (1982), which makes a juvenile proceeding fundamentally different from an adult criminal trial. We have tried, therefore, to strike a balance—to respect the "informality" and "flexibility" that characterize juvenile proceedings, *In re Winship, supra*, 397 U.S., at 366 [90 S.Ct. at 1074], ... and yet to ensure that such proceedings comport with the "fundamental fairness" demanded by the Due Process Clause. *Breed v. Jones, supra*, 421 U.S. at 531 [95 S.Ct. at 1786] ...; *McKeiver, supra*, 403 U.S., at 543 [91 S.Ct. at 1985] ... (plurality opinion).

Cases involving the detention of juveniles in adult facilities have been adjudicated under the "fundamental fairness" doctrine. Courts have divided on whether incarceration of juveniles in adult facilities is a *per se* violation of due process. *Compare Nelson v. Heyne*, 491 F.2d 352 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), *and Cox v. Turley*, 506 F.2d 1347, 1352–53 (6th Cir.1974) (dicta) (incarceration of juveniles with adults unconstitutional) *with Osorio v. Rios*, 429 F.Supp. 570 (D.P.R.1976) (three-judge panel) *and Cox v. Turley*, 506 F.2d at 1357 (Miller, J., concurring) (incarceration permissible under limited circumstances if proper procedures followed). But judges agree that a juvenile court system must maintain a *quid pro quo* under which juveniles who are deprived of the liberty without the full due process rights enjoyed by adults receive in return rehabilitative and individual treatment rather than mere punitive incarceration. *Baker v. Hamilton*, 345 F.Supp. 345 (W.D.Ky.1972), is an early articulation of this balancing formula:

... [S]elective placement of ... juveniles in the Jefferson County Jail ..., even though these commitments be for limited periods of time, constitutes a violation of

the Fourteenth Amendment in that it is treating for punitive purposes the juveniles as adults and yet not according them for due process purposes the right accorded to adults....

See also *Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354, 1368 ("If after a juvenile proceeding, the juvenile can be committed to a place of penal servitude, the entire claim of *parens patriae* becomes a hypocritical mockery.") (citation omitted); *Martarella v. Kelley*, 349 F.Supp. 575, 585 (S.D.N.Y.1972) ("Where the state, as *parens patriae*, imposes such detention, it can meet the Constitution's requirement of due process and prohibition of cruel and unusual punishment if, and only if, it furnishes adequate treatment to the detainee."). In *Nelson v. Heyne*, the Seventh Circuit held that the Supreme Court "has assumed, in passing on the validity of juvenile proceedings, that a state must provide treatment for juveniles." 491 F.2d at 353. The court quoted Justice Fortas' observation in *Kent v. United States*, 383 U.S. at 556, 86 S.Ct. at 1054:

> ... There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.

It is also observed that "[w]ithout a program of individual treatment the result may be that the juvenile will not be rehabilitated, but warehoused, and that at the termination of detention they will likely be incapable of taking their proper places in free society ..." 491 F.2d at 360.

Lastly, *D.B. v. Tewksbury*, 545 F.Supp. 896 (D.Or.1982), held that confinement in adult jails of juveniles who have not been remanded to the adult criminal courts constitutes a denial of constitutional rights which is not offset by a "special solicitude," and is thus fundamentally unfair.

> The supervisors at jails are guards—not guardians. Jails hold convicted criminals and adults charged with crimes. Jails are prisons, with social stigmas. Children identify with their surroundings. They may readily perceive themselves as criminals, for who goes to jail except criminals? A jail is not a place where a truly concerned natural parent would lodge his or her child for care and guidance. A jail is not a place where the state can constitutionally lodge its children under the guise of *parens patriae*.

*Id.* at 907.

 Doe I and Doe II were sent to an adult jail in violation of Ohio law and detained in a facility that was totally unequipped to provide juveniles with the individual treatment and counselling required by the Due Process Clause of the Fourteenth Amendment.[5]

---

5. Plaintiffs' pleadings do not carefully differentiate between their due process and equal protection claims, but their action is more appropriately brought under the Due Process Clause than the Equal Protection Clause. The crux of an equal protection claim is that "all persons similarly situated shall be treated alike," *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920), and courts utilize the Equal Protection Clause to determine whether legislative classifications have a rational basis or, if fundamental constitutional rights or suspect classifications are involved, whether the categories can withstand strict scrutiny. *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). An elemental prerequisite for equal protection analysis is that there be some legislative or administrative scheme or state-promulgated rules which are subject to judicial review. *Parham v. Hughes*, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979); *Konigsberg v. State Bar of California*, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); *Salibra v. Supreme Court of Ohio*, 730 F.2d 1059, 1062 n. 5 (6th Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984). A statute which arbitrarily sends certain juveniles to adult prisons is subject to equal protection attack. *Osorio v. Rios*, 429 F.Supp. at 575–76. But, since the plaintiffs here offer no criticism of the Ohio juvenile statute or rules, and simply challenge the *ad hoc* actions of a state judge and the individuals and entities who implemented, or failed to block, his orders, the Equal Protection Clause is not relevant to the claims before this Court.

### B. *Cruel and Unusual Punishment*

The Eighth Amendment prohibition against cruel and unusual punishment is binding on the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *Francis v. Resweber*, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947). In *Martarella v. Kelley*, Judge Lasker recognized that the *quid pro quo* under which the state as *parens patriae* may detain juveniles only if it provides adequate treatment to them implicates both due process and cruel and unusual punishment. 349 F.Supp. at 575. *Cf. Baker v. Hamilton*, 345 F.Supp. at 352–53; *Inmates of Boys' Training School v. Affleck*, 346 F.Supp. at 1366. As Judge Pettine noted in *Affleck*, incarceration of juveniles for rehabilitation violates the Eighth Amendment when the reality of the imprisonment is punishment, not treatment. The plaintiffs here were incarcerated in an adult facility which was admittedly unable to provide treatment. The sole purpose of the detention was to frighten Doe I and Doe II and direct them away from a life of crime. Such imprisonment without treatment violates juveniles' Eighth Amendment rights.

### C. *JJDPA*

The amended complaints also allege that the plaintiffs' incarceration violated the JJDPA's ban on incarcerating juveniles at adult facilities. 42 U.S.C. § 5633(12)(A). However, the statute does not provide an express private right of action, and its purpose and history do not give rise to an implied right of action under the test in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), or under § 1983 and § 1343(4). *Middlesex County Sewerage Authority v. National Sea Clammers Assn.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979). *See Cruz v. Collazo*, 84 F.R.D. 307, 313–14 (D.P.R.1979) (no private right of action under JJDPA). *Kentucky Assn. for Retarded Children v. Conn.*, 510 F.Supp. 1233, 1247 (W.D.Ky.1980), *aff'd on other grounds*, 674 F.2d 582 (6th Cir.1982), *cert. denied*, 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed.2d 609 (1983), cited by plaintiffs for its *sub silentio* recognition of a private right of action, failed to address these requirements. Accordingly, all claims brought directly under the JJDPA must be dismissed.

In sum, based on the undisputed facts, plaintiffs were incarcerated without due process, and subjected to cruel and unusual punishment, in violations of the Eighth and Fourteenth Amendments to the Constitution, and possess valid causes of action under § 1983. They do not possess a cause of action under the JJDPA.

### IV. JUVENILE INCARCERATION: BARRIERS TO RELIEF

The mere fact that plaintiffs' incarceration may have deprived them of constitutional rights does not necessarily entitle them to relief against any and all individuals who may have been involved, directly or indirectly, in their imprisonment. Since the essence of the allegations against the Sheriff and his staff, the County and the Commissioners is that they carried out Judge Harris' illegal orders or failed to halt them, the appropriate inquiry concerns the reach of Harris' absolute judicial immunity from damages.

### A. *Damages: Judicial and Quasi-Judicial Immunity*

The doctrine that judges are absolutely immune from civil suits for damages, one of the earliest products of English common law, was first recognized by the Supreme Court in 1868. *Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 19 L.Ed. 285 (1868). Absolute immunity leaves a judicial officer "free to act upon his own convictions, without apprehension of personal consequences to himself." *Stump v. Sparkman*, 435 U.S. 349, 355, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978) (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1872)). The doctrine protects judgments from continual collateral attack and

protects judges from interference and intimidation:

> It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making, but to intimidation.

*Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America and Its Locals 656 and 985 v. Greyhound Lines, Inc.*, 701 F.2d 1181, 1185 (6th Cir.1983).

■ Judicial immunity is forfeited only when a judge acts in "the clear abuse of all jurisdiction over the subject-matter," *Bradley v. Fisher*, 80 U.S. at 351; *Stump v. Sparkman*, 435 U.S. at 357, 98 S.Ct. at 1105, or engages in non-judicial or extra-judicial acts. *Id.* at 360, 98 S.Ct. at 1106. Such exceptions are read narrowly.

> ... First, a judicial officer does not act in the clear absence of all jurisdiction if he merely acts in excess of his authority.... The Supreme Court has held, for instance, that if a judicial officer exceeds his authority in a type of case that he normally has jurisdiction to hear, the officer has not acted in the clear absence of all jurisdiction....
>
> Second, the Supreme Court has specifically held that the commission of grave procedural errors, including those involving due process, does not constitute judicial action taken in the clear absence of all jurisdiction.

*Sevier v. Turner*, 742 F.2d 262, 271 (6th Cir.1984) (citations omitted). Presumably, these limitations explain the plaintiffs' failure to name Judge Harris as a defendant.

■ McFaul, Brown, Pace and the individual corrections officers, who implemented Judge Harris' illegal and unconstitutional but clearly "judicial" orders, share his absolute immunity from damages under the doctrine of "quasi-judicial immunity." The Sixth Circuit has repeatedly extended the absolute immunity accorded to judges to other individuals involved in the judicial process.

Initially, it is settled that judicial immunity, which has historically protected judges acting in their official capacity, *Pierson v. Ray*, ... also attaches to public officials who perform quasi-judicial duties. *Johnson v. Granholm*, 662 F.2d 449 (6th Cir.1981) [(per curiam)], *cert. denied*, 457 U.S. 1120 [102 S.Ct. 2933, 73 L.Ed.2d 1332] ... (1982).

*Campbell v. Patterson*, 724 F.2d 41, 43 (6th Cir.1983) (per curiam), *cert. denied*, — U.S. —, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984). In *Campbell*, the court extended immunity to the Michigan Attorney General for his opinions interpreting state law, and to the state prison officials who acted in accordance with those opinions. *Id.* In *Johnson v. Granholm*, on which the *Campbell* court relied, the court held that absolute immunity "attaches to the activities of other public officials who perform quasi-judicial duties. *Denman v. Leedy*, 479 F.2d 1097 (6th Cir.1973) [(per curiam)]." *Denman*, in turn, held that judicial immunity covered the official actions of the Clerk of the Municipal Court of Wooster, Ohio. 479 F.2d at 1098. *See also Timson v. Wright*, 532 F.2d 552, 553 (6th Cir. 1976) (per curiam) (and cases cited therein). *Vicory v. Walton*, 721 F.2d 1062 (6th Cir. 1983), *cert. denied*, — U.S. —, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984), indicated that a sheriff who "performed a ministerial function as directed by the prosecutor" should share the prosecutor's absolute immunity. *Id.* at 1066 (Bertelsman, J., concurring). Consistency requires that the same immunity be accorded to a sheriff and other jail personnel who obeyed a facially valid judicial order to incarcerate juveniles.

Other courts of appeals share the Sixth Circuit's view on quasi-judicial immunity. Absolute immunity generally applies to individuals "acting under the command of a court decree or explicit instructions from a judge." *Henriksen v. Bentley*, 644 F.2d

852, 855 (10th Cir.1981) (and cases cited therein). The rationale for sweeping so many individuals under the protection of the judicial robes was explained in *Ashbrook v. Hoffman,* 617 F.2d 474, 476 (7th Cir.1980):

> ... The same policies which underlie the grant of absolute judicial immunity to judges justify the grant of immunity to those conducting activities intimately related to the judicial process.... On one hand is the policy that an official making quasi-judicial discretionary judgments should be free of the harassment of private litigation in making those judgments.... On the other hand a non-judicial officer who is delegated judicial duties in aid of the court should not be a 'lightning rod for harassing litigation' aimed at the court.... Thus, if 'acts alleged to [be] wrongful, were committed by the officer in the performance of an integral part of the judicial process,' ... then the official is absolutely immune from suit. (Citations omitted).

*Ashbrook* extended absolute judicial immunity to partition commissioners appointed by a state court to handle a property transaction. *See also Kermit Construction Corp. v. Banco Credito Y Ahorro Ponceno,* 547 F.2d 1 (1st Cir.1976) (receivers); *Lockhart v. Hoenstine,* 411 F.2d 455 (3d Cir.), *cert. denied,* 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969) (prothonotaries); *Stift v. Lynch,* 267 F.2d 237 (7th Cir.1959) (justices of the peace); *Simons v. Bellinger,* 643 F.2d 774 (D.C.Cir.1980) (committee appointed by court of appeals to monitor unauthorized practice of law); *Crosby-Bey v. Jansson,* 586 F.Supp. 96, 98 (D.D.C.1984) (and cases cited therein) (probation officers); *Weiss v. Feigenbaum,* 558 F.Supp. 265, 272 (E.D.N.Y.1982) (referees).

It follows logically that the remaining defendants—the County, the Commissioners, and Judge Spellacy—cannot be subject to liability for their failure to overrule, countermand, challenge, or otherwise interfere with Judge Harris' facially valid order. Plaintiffs point to no case law supporting the proposition that a state official violates the Constitution or civil rights stat-

utes by failing to attack a state court judgment.

Accordingly, the doctrine of absolute judicial immunity and quasi-judicial immunity require that judgment be entered for all of the defendants with respect to the allegation that plaintiffs' incarceration at the Corrections Center, in and of itself, entitles them to damages.

## B. *Declaratory Relief: Absence of a Case or Controversy*

The amended complaints also seek declaratory judgments, pursuant to 28 U.S.C. §§ 2201–02 and Fed.R.Civ.P. 57, that the incarceration of the plaintiffs violated their statutory rights under § 1983, the JJDPA, and the Ohio Juvenile Code and their constitutional right to due process, freedom from cruel and unusual punishment, and "right to receive treatment in the least restrictive setting and under the least restrictive conditions ..." In light of the disposition of plaintiffs' damages claims on the incarceration issue, this Court must *sua sponte* determine whether a "case or controversy" exists which provides the plaintiffs with Article III standing to seek declaratory relief. On consideration, the prayer for declaratory relief must be dismissed.

Under Article III, litigants may invoke the jurisdiction of the federal courts only by alleging an actual case or controversy. *Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968); *Jenkins v. McKeithen,* 395 U.S. 411, 421–25, 89 S.Ct. 1843, 1848–51, 23 L.Ed.2d 404 (1969) (plurality opinion). "Case or controversy" requirements apply with full force in actions seeking a declaratory judgment. More precise explication of these principles is found in *Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977) (per curiam), and *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

In *Ashcroft v. Mattis,* the plaintiff brought a § 1983 suit against police officers who shot and killed his son, seeking damages and a declaration that the Missou-

ri statute which authorized deadly force in apprehending a fleeing felon was unconstitutional. The district court sustained the defendants' good faith immunity claim. The plaintiff appealed only the denial of declaratory relief; the Eighth Circuit held that declaratory relief was available and remanded for district court consideration of the constitutional issue. The Supreme Court reversed.

> ... This suit was brought to determine the police officers' liability for the death of appellee's son. That issue has been decided and there is no longer any possible basis for a damages claim. Nor is there any possible basis for a declaratory judgment. For a declaratory judgment to issue, there must be a dispute which "calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts." ... Here, the District Court was asked to answer the hypothetical question whether the defendants would have been liable apart from their defense of good faith. No "present right" of appellee was at stake.

431 U.S. at 172, 97 S.Ct. at 1740 (citations omitted).

*Ashcroft* was endorsed and extended in *Lyons*, another lawsuit commenced against police officers. Lyons sought damages for injuries received from a choke hold administered by the Los Angeles police. He also sought an injunction and declaratory relief against the city to prohibit choke holds "except in situations where the proposed victim of said control reasonably appears to be threatening immediate use of deadly force" and to declare that choke holds are a *per se* violation of constitutional rights if administered in the absence of the threat of immediate use of deadly force. The district court dismissed the claims, the Ninth Circuit reversed, and on remand the lower court granted a preliminary injunction enjoining choke holds "under circumstances which do not threaten death or severe bodily injury."

The Supreme Court reversed because of Lyons' failure to "show that he 'has sustained or is in immediate danger of sustaining some direct injury' as the result of the challenged official conduct and [that] the injury or threat of injury [were] ... 'real and immediate,' not 'conjectural' or 'hypothetical.'" 461 U.S. at 102, 103 S.Ct. at 1665 (quoting *Golden v. Zwickler*, 394 U.S. 103, 109–10, 89 S.Ct. 956, 960–61, 22 L.Ed.2d 113 (1969)). It reiterated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974)). And it stated:

> ... That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part. The additional allegation in the complaint that the police in Los Angeles routinely apply choke-holds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties.

> \* \* \* \* \* \*

> ... If Lyons has made no showing that he is realistically threatened by a repetition of his experience of October, 1976, then he has not met the requirements for seeking an injunction in a federal court ...

*Id.* 394 U.S. at 105, 109, 89 S.Ct. 956, 960.

■ Like Lyons, Doe I and Doe II attack a policy, albeit a now-discontinued informal policy of a single state court judge, which deprives citizens of constitutional rights. But they cannot "establish any real and immediate threat" that they will again be injured in similar fashion: both plaintiffs have attained their majority and can never again be damaged by the illegal incarceration of juveniles in an adult jail.

*Lyons'* standing rules govern all forms of equitable relief, both declaratory and injunctive. *Haislah v. Walton,* 748 F.2d 359 at 360–61, slip op. at 2–4 (6th Cir.1984); *Brown v. Edwards,* 721 F.2d 1442, 1446–47 (5th Cir.1984); *Buie v. Jones,* 717 F.2d 925, 917–29 (4th Cir.1983). Accordingly, this Court holds that *Lyons* strips plaintiffs of standing [6] to seek declaratory relief.[7]

## V. OTHER CLAIMS AND DEFENSES

Plaintiffs' request for damages therefore rests on Counts 1 and 5–7 of the amended complaints. Count 1 alleges that the defendants' entire course of conduct, including the allegedly inadequate security in the Corrections Center which permitted the attacks on Doe I and Doe II to take place, "constitutes a pattern, practice and custom and negligent, wilfull and wanton disregard and deliberate indifference to the safety of the plaintiff and other juveniles." Counts 5–7 involve pendent state tort claims. Defendants contend that, in addition to their immunity for damages for implementing Judge Harris' incarceration orders, they are also entitled to summary judgment on all remaining claims. Differ-

**6.** It is important to note that this conclusion rests on questions of standing, not mootness. "It is well-settled that the voluntary cessation of allegedly unlawful conduct does not moot a case in which the legality of that conduct has been placed in issue." *Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, —— & n. 4, 104 S.Ct. 373, 377 & n. 4, 78 L.Ed.2d 58 (1983) (and cases cited therein). In other words, if plaintiffs had standing, and if they had named Judge Harris as a defendant, his termination of the "Scared Straight" program would not preclude this Court from issuing declaratory or injunctive relief against him. *See Pulliam v. Allen,* —— U.S. ——, 104 S.Ct. 1970, 1981–92, 80 L.Ed.2d 565 (1984) (judicial immunity does not bar equitable relief capacity). However, the *Lyons* court made clear that standing is indispensable when relief is sought after a defendant's voluntary cessation. "[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." 461 U.S. at 109, 103 S.Ct. at 1669.

**7.** The result *Lyons* compels is deeply troubling to this Court:

The Court's decision removes an entire class of constitutional violations from the equitable powers of a federal court. It immunizes from

ent reasons are presented for the Sheriff and his staff, the County and the Commissioners, and Judge Spellacy.

### A. *Protection from Attack by Fellow Inmates*

Count 1 of the amended complaints clearly presents a valid cause of action under § 1983. The Eighth and Fourteenth Amendments provide prisoners with a right to be free from attacks by fellow inmates. *Miller v. Solem,* 728 F.2d 1020, 1024 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984); *Branchcomb v. Brewer,* 669 F.2d 1297, 1298 (8th Cir.1982), *after remand,* 683 F.2d 251 (8th Cir.1982); *Clark v. Taylor,* 710 F.2d 4, 9 (1st Cir.1983); *Little v. Walker,* 552 F.2d 193 (7th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978); *cf. Estelle v. Gamble,* 429 U.S. 97, 104–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976); *Wilson v. Beebe,* 743 F.2d 342, 349 (6th Cir.1984). The liability of state officials for failing to prevent such attacks is premised on the notion that § 1983 liability "may be imposed both for action that deprives a

prospective equitable relief any policy that authorizes persistent deprivations of constitutional rights as long as no individual can establish with substantial certainty that he will be injured, or injured again, in the future. THE CHIEF JUSTICE asked in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 419, 91 S.Ct. 1999, 2016, 29 L.Ed.2d 619 ... (1971) (dissenting opinion), "what would be the judicial response to a police order authorizing 'shoot to kill' with respect to every fugitive?" His answer was that it would be "easy to predict our collective wrath and outrage." *Ibid.* We now learn that wrath and outrage cannot be translated into an order to cease the unconstitutional practice, but only an award of damages to those who are victimized by the practice and live to sue and to the survivors of those who are not so fortunate. Under the view expressed by the majority today, if the police adopt a policy of "shoot to kill," or a policy of shooting one of ten suspects, the federal courts will be powerless to enjoin its continuation.... The federal judicial power is now limited to levying a toll for such a systematic constitutional violation.
461 U.S. at 137, 103 S.Ct. at 1684 (Marshall, J., dissenting).

plaintiff of a constitutional right and for failure to act, when there is a duty to act, to prevent such a deprivation." *Clark v. Taylor,* 710 F.2d at 9 (citing *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961)). To sustain this constitutional tort claim, a plaintiff

> ... must show something more than mere inadvertence or negligence. He must show the defendants were deliberately indifferent to his constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates.

*Branchcomb v. Brewer,* 669 F.2d at 1298.

The Supreme Court adopted essentially the same position in *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Affirming a jury verdict against a prison guard, Smith, who displayed "gross negligence" or "egregious failure to protect" a prisoner from attack, the Court stated:

> ... Smith is protected from liability for mere negligence because of the need to protect his use of discretion in his day-to-day decisions in the running of a correctional facility. See generally *Procunier v. Navarette,* 434 U.S. 555 [98 S.Ct. 855, 55 L.Ed.2d 24] (1978); *Wood v. Strickland,* 420 U.S. 308 [95 S.Ct. 992, 43 L.Ed.2d 214] (1975). But the immunity on which Smith relies is coextensive with the interest it protects. The very fact that the privilege is qualified reflects a recognition there is no societal interest in protecting those uses of a prison guard's discretion that amount to reckless or callous indifference to the rights and safety of the prisoners in his charge. Once the protected sphere of privilege is exceeded, we see no reason why state officers should not liable for their reckless misconduct on the same basis as private tortfeasors.

*Id.* 461 U.S. at 55, 103 S.Ct. at 1640 (footnotes omitted).

Under these standards, Doe I and Doe II clearly state a cause of action against the guards; Count 1, as phrased, also states a cause of action against the Sheriff and his supervisory staff, the County, and the Commissioners. "Deliberate indifference" is a matter for proof at trial, and cannot be deduced from the undisputed facts as set forth in plaintiffs' motion for partial summary judgment. With that, this Court turns to the defendants' claims that they are entitled to summary judgment.

### B. *Defendants' Summary Judgment Claims*

#### 1. Cuyahoga County

Municipal bodies, including counties, are not immune from § 1983 actions. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Owen v. City of Independence, Missouri,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). But under *Monell* and its progeny, a municipal entity cannot be held liable solely on a respondeat superior theory.

> ... Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels....

*Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2035–36. *Hays v. Jefferson County,* 668 F.2d 869, 873 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982); *Id.* at 876 (Merritt, J., dissenting); *Dunn v. State of Tennessee,* 697 F.2d 121, 128 (6th Cir.1982), *cert. denied,* 460 U.S. 1086, 103

S.Ct. 1778, 76 L.Ed.2d 349 (1983); *see Rowland v. Mad River Local School District, Montgomery County, Ohio,* 730 F.2d 444, 451 (6th Cir.1984); *Taylor v. Canton, Ohio Police Dept.,* 544 F.Supp. 783, 788 (N.D. Ohio 1982).

▆ The plaintiffs argue that Cuyahoga County possessed "constructive knowledge" that juveniles were being housed in the Corrections Center in violation of applicable law through its alleged awareness of the acts and omissions of the Sheriff, the Commissioners, Judge Spellacy, and all other County employees. Their theory is that once the County constructively knew of the violations "there arose a direct obligation to seek specific advice of counsel," that the Sheriff and his staff "should have sought appropriate advice prior to establishing the 'Scared Straight' program,'" that "[s]uch an omission in the face of outrageous injuries to Plaintiffs, constitutes clear and deliberate disregard for the personal safety and constitutional rights of the Plaintiffs," and that in general the County's conduct "through its failure to supervise, to investigate, and to control the conduct of its agents has established a pattern or practice of allowing the jailing of children in violation of their constitutional rights." Brief at 16–16.

None of these arguments addresses the question of whether the County maintained a policy, practice or custom, formally or informally, under which Corrections Center authorities were deliberately indifferent to prisoners' right to be protected from attack. Plaintiffs point to no evidence in the record indicating that such a policy existed. The County's motion for summary judgment must be granted with respect to Count 1. Accordingly, all federal claims against the County have been dismissed from this case.

2. The Commissioners and the Sheriff

▆ The Sixth Circuit has recently reiterated that

.. the § 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984) (citing *Hays v. Jefferson County,* 668 F.2d at 872–74); *Smith v. Heath,* 691 F.2d 220, 225 (6th Cir.1982). Such direct participation can apparently be inferred from a supervisory official's negligence. *Brandon v. Allen,* 719 F.2d 151, 153–54 (6th Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 2384, 81 L.Ed.2d 342 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). *See Lopez v. Ruhl,* 584 F.Supp. 639, 649 (W.D.Mich. 1984) ("negligence in failing to prevent the constitutional deprivation may suffice to support a § 1983 claim") (citing *Brandon v. Allen*).

▆ In *Lopez v. Ruhl,* the court held that factual questions concerning a sheriff's negligence in not knowing about alleged constitutional violations committed by an officer precluded summary judgment in favor of the sheriff. Here, however, plaintiffs offer no evidence that the Commissioners negligently authorized, approved, acquiesced in or failed to prevent the Corrections Center's alleged "deliberate indifference" to plaintiffs' right to be free from attack by other inmates. Such an obligation extends only to the Sheriff and his staff, not to all ranking County officials.

Accordingly, summary judgment is granted to the Commissioners with respect to the "deliberate indifference" claims of Count 1. However, the unclear factual record with respect to events inside the pods during the attacks on Doe I and Doe II precludes granting summary judgment to the Sheriff or other members of the jail staff under the *Brandon v. Allen* standard. *Lopez v. Ruhl,* 584 F.Supp. at 649–50; *Minority Employees of the Tennessee*

Department of Employment Security, Inc. v. State of Tennessee, Department of Employment Security, 573 F.Supp. 1350, 1353–54 (M.D.Tenn.1983) (failure to supervise properly) (citing Barksdale v. King, 699 F.2d 744, 746 (5th Cir.1983) (per curiam)).

### 3. Judge Spellacy

 Summary judgment must also be granted in favor of Judge Spellacy with respect to Count 1. Plaintiffs seek to hold him liable by alleging that "Spellacy is the administrative judge of the Court of Common Pleas and in that capacity supervises and approves the policies and procedures within the Cuyahoga County Jail." It should be clear, however, that not even the most flexible negligence standard would permit a finding that Spellacy negligently failed to know of, and stop, violations of plaintiffs' constitutional right to be free from attack. Moreover, Ohio Rev.Code § 341.06 merely requires the Court of Common Pleas, through the presiding or administrative judge, to issue rules for the regulation and government of the Corrections Center; plaintiffs do not challenge those rules, and in fact rely upon them. Another reading of plaintiffs' allegations against Judge Spellacy is that he failed to exercise supervisory authority over the Juvenile Court. Neither § 1983 nor Ohio law creates any such duty, and any failing by Judge Spellacy in that regard would certainly be a judicial act within the scope of Bradley v. Fisher, Stump v. Sparkman, and Sevier v. Turner.

Finally, plaintiffs' reliance on Supreme Court of Virginia v. Consumers Union of the United States, Inc., 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), is wholly misplaced. There the Court permitted a suit seeking declaratory and injunctive relief with respect to particular provisions of the State Bar Code promulgated by Virginia's highest court. That "the Virginia Court and its chief justice properly were held liable in their enforcement capacities," Id. 446 U.S. at 736, 100 S.Ct. at 1977, is not relevant to Judge Spellacy's alleged negligence in failing to learn of lapses by jail guards.

## VI. CONCLUSION

Based on the preceding analysis, this Court must deny plaintiffs' motion for partial summary judgment and enter summary judgment in favor of the defendants with respect to all federal constitutional claims for damages and declaratory relief in Counts 1–5 arising solely from the fact of plaintiffs' incarceration at the Corrections Center. All claims under the JJDPA must also be dismissed.

With respect to Count 1 of the amended complaints, this Court holds that plaintiffs state a cause of action under § 1983 and the Eighth and Fourteenth Amendments for deliberate indifference to their right to be free from attack by other inmates. Because the facts surrounding the assaults of Doe I and Doe II are disputed, plaintiffs' motion for partial summary judgment are denied. In the absence of any evidence against the County, the Commissioners, or Judge Spellacy satisfying the applicable legal standards, summary judgment is entered in their favor on this claim. Summary judgment is denied with respect to the Count 1 claims against McFaul, Brown, Pace, and the individual corrections officers. Their liability is a question for juries, in separate trials.

The pendent claims in Counts 5–7 have not been discussed in the summary judgment motions. As a result, the pendent claims against the Sheriff and his staff are, like the federal claims, questions for jury trial (or for additional motions). The pendent claims against the County, the Commissioners, and Judge Spellacy, however, are more problematic. This Court has serious doubts about whether the complaint states causes of action against them for false imprisonment (Count 5), intentional infliction of emotional distress (Count 6), or negligently confining the plaintiffs in an inadequate institution (Count 7). However, rather than dismiss these claims sua sponte, and rather than reach the question of whether they must be dismissed under the "pendent party jurisdiction" doctrine set forth in Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); see

13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3567.2 (1984), this Court will simply decline to exercise jurisdiction over the pendent claims against the County, the Commissioners and Judge Spellacy. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); 3A J. Moore and J. Lucas, *Moore's Federal Practice* ¶ 18.07[1.–3] at 18–59 (2d ed. 1982 & Supp.1983–84). Those claims are therefore dismissed, without prejudice.

All claims in *Doe I* against James McTigue are dismissed, with prejudice.

IT IS SO ORDERED.