Jessica S. TAYLOR, minor; Pamela J. Taylor; and Richard Taylor, Plaintiffs–Appellants,

v.

MEDTRONICS, INC., Defendant–Appellee.

No. 88–3069.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 6, 1988.

Decided Nov. 22, 1988.

Wilbur C. Jacobs (argued), Toledo, Ohio, for plaintiffs-appellants.

David M. Jones (argued), Eastman & Smith, Toledo, Ohio, for defendant-appellee.

Before KEITH, GUY and NORRIS, Circuit Judges.

RALPH B. GUY, Jr. Circuit Judge.

Plaintiffs, Richard and Pamela Taylor, filed suit on behalf of their infant daughter, Jessica S. Taylor, alleging that the pacemaker system which had been implanted in Jessica was defective. The complaint named both the manufacturer of the pacemaker, Pacesetters Systems, Inc., and the manufacturer of the lead wires which connected the pacemaker to Jessica's heart, Medtronics, Inc. The complaint alleged that the first pacemaker would not operate properly and therefore had to be replaced within a year of the original implantation. Despite repeated attempts, defendants were unable to schedule a deposition of the plaintiffs' expert witness so the defendants filed a motion with the district court seeking an order to compel discovery. Defendants also requested the imposition of sanctions against plaintiffs' counsel. The court initially declined to grant the motion for sanctions; however, after the plaintiffs' counsel repeatedly failed to comply with the court's orders, the court granted defendants' motion for sanctions and ordered that the affidavit of plaintiffs' expert witness be stricken from the record. The court also granted defendant Pacesetters' motion for summary judgment finding no issue of material fact in the absence of any expert opinion which would support plaintiffs' claims. The court also vacated its previous denial of a summary judgment motion and entered summary judgment in favor of defendant Medtronics. The district court denied plaintiffs' motion to reconsider and plaintiffs appealed to this court. For the following reasons, we find that the district court did not abuse its discretion by imposing sanctions in response to the plaintiffs' counsel's disregard of the district court's discovery orders. Furthermore, we find that the district court properly granted summary judgment in favor of defendants, since there was no genuine issue of material fact and the defendants were entitled to judgment as a matter of law.

I.

At the age of nineteen months, Jessica Taylor began to suffer from loss of consciousness. Upon admission to the hospital, it was determined that the symptoms were the result of an irregular heartbeat and she underwent emergency surgery for the implantation of a pacemaker device which would artificially regulate the beating of her heart. The surgeon, Dr. J. Terrance Davis, attached two separate wires (leads) to the outer surface of Jessica's heart. The leads, designated Model 4951, were manufactured by defendant Medtronics. Leads conduct electrical pulses from the "pacemaker" or "pulse generator" to the heart muscle. The leads also conduct the heart's natural electrical current, the "R-wave," back to the pulse generator. A disruption in the normal R-wave pattern causes the pulse generator to fire, thereby artificially stimulating the heart muscle. All of the leads attached to Jessica's heart

were connected to a pulse generator that was inserted into her abdomen. The pulse generator was manufactured by defendant Pacesetters.

Initially, the operation appeared to be successful. Within a year, however, Jessica again began to experience blackouts caused by an irregular heartbeat. Consequently, in October, 1983, Dr. Davis removed the pulse generator from Jessica's abdomen and replaced it with a unipolar (single-wire) generator. The remaining lead was "capped off."

On March 4, 1985, plaintiffs filed a complaint against Pacesetters System, Inc., and Medtronics, Inc., alleging that the leads and the pulse generator which were implanted in Jessica's body in October, 1982, were defective. Plaintiffs requested $3.5 million in compensatory damages and an additional $3 million in punitive damages.

On February 4, 1987, defendant Medtronics filed a motion for summary judgment, based on Dr. Davis's deposition and on an affidavit of a cardiology expert, Dr. Robert G. Hauser. Dr. Hauser's affidavit concluded that Jessica's problems were solely attributable to a "lead-tissue interface anomaly" which was not caused by either the pulse generator or the Medtronics' leads. The lead-tissue interface anomaly is a condition which develops in the heart tissue surrounding the connection to the lead wire and inhibits the passage of the low-voltage R-waves from the heart tissue into the lead wire. Because the pulse generator was not receiving the low voltage R-waves, the pulse generator "thought" that Jessica's heart was not beating on its own and therefore sent unnecessary pulsing signals to her heart. According to Dr. Hauser, lead tissue interface anomaly is a well-known complication of permanent cardiac pacing, especially in cases involving younger children. Dr. Davis testified in his deposition that he conducted electrical testing of the two Medtronics' leads at the time he replaced the pulse generator in Jessica's abdomen. As a result of those tests, he determined that the wire was not broken, that there was no break in the insulation,

and that the leads themselves were functioning properly. Therefore, he concluded that Jessica's pacing problems were attributable to a lead-tissue interface anomaly at one of the connections to the heart. Furthermore, Dr. Davis testified that, because this anomaly is not uncommon, he routinely installs two leads so that, in the event of such a problem, he can easily "cap" one lead and change the system to a one-lead (unipolar) system. This is the procedure which he followed in Jessica's case, and he testified that, to his knowledge, Jessica has not suffered any further problems attributable to the pacing system.

On February 10, 1987, defendant Pacesetters filed a renewed and supplemental motion for summary judgment based on the opinions of Dr. Davis and Dr. Hauser and other experts who also concluded that Jessica's previous problems were attributable to a lead-tissue interface anomaly problem. The court granted plaintiffs two extensions of time within which to file their opposition to defendants' motions for summary judgment. On April 20, 1987, plaintiffs filed their brief in opposition. The plaintiffs' brief included the affidavit of Dr. Barry Feinberg who testified that, in his opinion, "[t]he preponderance of evidence contained in the medical records and ECG-rhythm strips indicated conclusively that the pacing system failed...." On June 12, 1987, the court denied the motion of defendant Medtronics for summary judgment "because Dr. Feinberg's report raises triable issues of fact." The court reserved judgment on Pacesetters' summary judgment motion in order to allow Pacesetters time to file a reply to the plaintiffs' opposition brief. On August 25, 1987, the court set a trial date for January 26, 1988, and a discovery cut-off date of December 15, 1987.

On September 24, 1987, defendant Pacesetters filed a motion seeking an order to compel plaintiffs to set three dates for testing the pulse generator and three dates for the taking of the deposition of Dr. Feinberg. The motion recited that Pacesetters' counsel and counsel for plaintiffs had been unable to reach an agreement on the dates even though plaintiffs' counsel had prom-

ised as early as April of 1987 to produce Dr. Feinberg for deposition. In addition to its motion to compel discovery, defendant Pacesetters also moved for sanctions, arguing that the dilatory responses by plaintiffs' counsel to the defendants' discovery requests were part of an intentional plan to delay the proceedings and thereby increase the cost of litigation to the defendants.

The court declined to grant Pacesetters' motion for sanctions; however, on October 1, 1987, the court issued a brief order requiring the plaintiffs to respond to defendants' discovery requests. Specifically, the order stated that plaintiffs were to identify three testing dates between October 1 and October 14, 1987, as well as three deposition dates between October 14 and October 23, 1987. In addition, the order contained a warning that a failure to comply would result in the imposition of sanctions.

In response to the court's order of October 1, 1987, plaintiffs' counsel moved for a two-week extension of the deadlines. Among the reasons given for the request were that counsel for plaintiffs was going on vacation to see his grandchild. On October 7, 1987, the district court granted the plaintiffs' motion for a two-week extension. On October 19, 1987, defendant Pacesetters filed a motion to prohibit Dr. Feinberg from testifying at trial and striking his affidavit because plaintiffs had still not provided defendants with three dates for the testing of the pacemaker and the deposition of Dr. Feinberg. On October 22, 1987, Medtronics filed a motion to compel plaintiffs to make Dr. Feinberg available for deposition in accordance with the previous court order. On November 2, 1987, the district court issued an order awarding defendants attorney's fees and costs incurred in obtaining the order. The November 2, 1987, order also ordered plaintiffs to identify three testing dates between November 12, 1987, and November 25, 1987, and further ordered plaintiffs to identify three dates between November 16, 1987, and November 30, 1987, on which Dr. Feinberg could be deposed. With respect to the defendants' request for further sanctions, the court stated:

Defendant has also requested that the affidavit of Dr. Feinberg be stricken and that plaintiffs be prohibited from introducing any expert testimony in support of their claims at trial. However, due to the nature of the other sanctions requested by defendant Pacesetters and the potential effect on plaintiffs' ability to present a case in this action, for now, the court is inclined to deny those sanctions. Despite this ruling, *the court cautions the plaintiffs that they have received their last chance.* No further delays in the discovery process will be countenanced. From this point forward, the plaintiffs must strictly comply with the court orders and the civil rules or face the consequences. Simply put, the plaintiffs will no longer be permitted to deliberately and callously disregard their responsibilities under the rules of discovery and of this court's orders....

(Emphasis added).

Notwithstanding the explicit threat of sanctions contained in the court's November 2, 1987 order, plaintiffs' counsel failed to meet the November 12, 1987, deadline for scheduling the dates for testing and deposition of Dr. Feinberg. On November 6, 1987, Pacesetters filed another motion for sanctions. In that motion, counsel for Pacesetters represented to the court that counsel for plaintiffs had proposed by letter that the deposition of Dr. Feinberg be taken on December 10, December 11, or December 14, even though those dates were beyond the November 30 deadline established by the district court. On November 17, 1987, plaintiffs filed a memorandum with regard to Pacesetters' motion for sanctions and indicated that Dr. Feinberg would be requested to reschedule other matters so that he could test the pulse generator on November 24. Plaintiffs also indicated that the earliest dates available for Dr. Feinberg's deposition would be December 10, 11, or 14. Plaintiffs made no request that the court grant another extension of the deadlines previously established in the November 2 order. In response to the plaintiffs' memorandum, defendant Pacesetters filed a reply on November 24, 1987. Attached to the reply brief was a

copy of a letter from Dr. Feinberg to Mr. Jacobs, plaintiffs' counsel, dated October 16, 1987. In his letter, Dr. Feinberg indicated that November 2–10, November 16–18, and November 23–25, 1987, were open for the testing of the cardiac device. Pacesetters also attached a copy of the letter sent to them from plaintiffs' counsel dated November 4, 1987, in which plaintiffs' counsel indicated that Dr. Feinberg would conduct a test on November 25, 1987, and that he would not be available for a deposition until December 10, 11, or 14, 1987. Thus, the representations contained in the November 4, 1987, letter from plaintiffs' counsel contradicted the information contained in the October 16 letter from plaintiffs' expert witness indicating that he would be available as early as November 2, 1987.

On December 4, 1987, Medtronics filed a notice to take deposition of Dr. Feinberg in Chicago, and also filed a motion for sanctions prohibiting Dr. Feinberg's testimony because plaintiffs had violated the prior court order with regard to the deposition. In addition, counsel for Medtronics represented to the court that counsel for the plaintiffs had recently advised that Dr. Feinberg would not be available for deposition until "sometime during the first week of January, 1988."

On December 7, 1987, plaintiffs filed yet another motion for an extension of the time for discovery. Plaintiffs also requested a continuance of the trial date in order to allow for further discovery. In their motion, plaintiffs represented that Dr. Feinberg tested the pulse generator on November 30, 1987, and discovered that it seemed to function properly; however, plaintiffs felt that additional testing would be necessary. Furthermore, plaintiffs claim that "[b]ecause of prior commitments the earliest Dr. Feinberg can schedule his deposition is January 18, 1988 . . . ."

The following day, on December 8, 1987, the district court issued an opinion and order imposing sanctions against plaintiffs pursuant to Rule 37 of the Federal Rules of Civil Procedure. The twelve-page opinion summarized the history of the discovery proceedings in the litigation and concluded that "plaintiffs' and their counsel's recalcitrant conduct and continuous flouting of the court's authority furnishes proof of willfulness, rather than an inability to comply with the court's discovery orders." Specifically, the court found that plaintiffs' counsel had failed to comply with the discovery orders dated October 1, 1987, October 7, 1987, and November 2, 1987. The court found that noncompliance was "deliberate, willful and unjustified," especially in light of the October 16 letter from Dr. Feinberg stating that he would be available from November 2–10, 16–18, and 23–25. The court also noted that it had previously granted several extensions in order to accommodate plaintiffs' counsel's trial schedule, vacation dates, and the marriage of his daughter. In addition, the court noted that it had denied several previous requests for sanctions against plaintiffs and that it had given explicit warning that failure to comply with its November 2 order would result in the imposition of sanctions. Finally, the court noted that plaintiffs' noncompliance with the court's discovery orders had materially prejudiced the defendants since the delay in the deposition of Dr. Feinberg would prevent the defendants from engaging in any further discovery prior to the discovery cut-off date of December 15, 1987, and the trial date of January 26, 1988. In conclusion, the court found that, "under these circumstances, for this court to fail to order sanctions would be an unspoken endorsement of the plaintiffs' flagrant disregard for this court's orders." Accordingly, the district court imposed the following sanctions: (1) the affidavit of Dr. Barry Feinberg was stricken from the record, and (2) plaintiffs were ordered to pay Pacesetters' attorney's fees and costs incurred in preparing the motion for sanctions.

In addition to imposing sanctions against plaintiffs, the court also went on to consider Pacesetters' pending motion for summary judgment. The court noted that Pacesetters' motion was supported by the affidavits and depositions of experts including the operating surgeon, who concluded that neither the pulse generator nor the lead

wires connecting it to the heart were defective but, rather, that Jessica Taylor's condition stemmed from a lead-tissue interface anomaly. Having stricken the affidavit of plaintiffs' expert witness, Dr. Feinberg, the court found that defendant Pacesetters was entitled to summary judgment based on the uncontradicted expert opinions of Dr. Robert Hauser and Dr. Davis. In addition, the court *sua sponte* reconsidered its previous ruling on defendant Medtronics' motion for summary judgment. In the absence of Dr. Feinberg's affidavit, the court found that there was no longer an issue of material fact and that defendant Medtronics was entitled to judgment as a matter of law. Accordingly, summary judgment was entered in favor of both defendant Pacesetters and defendant Medtronics.

On December 10, 1987, plaintiffs filed a motion for "emergency reconsideration" of the court's December 8 order imposing sanctions and granting summary judgment in favor of defendants. On December 22, 1987, the district court issued another opinion and order denying plaintiffs' motion for reconsideration. The district court again summarized the discovery history of the case and found that sanctions imposed were appropriate in light of the plaintiffs' willful failure to comply with the court's discovery orders. The court further found that the plaintiffs' documentary evidence, standing alone without the affidavit of Dr. Feinberg, was insufficient to create a genuine issue of material fact and, therefore, the court reaffirmed its grant of summary judgment in favor of defendants. On January 15, 1988, plaintiffs' counsel filed a notice of appeal to this court appealing the imposition of sanctions, the grant of summary judgment in favor of defendants, the dismissal, and the subsequent order denying the motion for reconsideration. The notice also states: "This appeal is taken against defendant Medtronics, Inc. only and is not taken against Pacesetters Systems, Inc." Apparently, plaintiffs had decided to abandon their claims against Pacesetters and, instead, concentrate their efforts against defendant Medtronics which manufactured the leads.

## II.

Under Rule 37 of the Federal Rules of Civil Procedure, when a party fails to comply with the court's discovery order, the court "may make such orders in regard to the failure as are just...." Fed.R.Civ.P. 37(b)(2). The court may impose a variety of sanctions including:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;....

Fed.R.Civ.P. 37(b)(2)(A–C). It is well established that court orders imposing sanctions under this rule, including the ultimate sanction of dismissal, are reviewable only for abuse of discretion. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Regional Refuse Systems v. Inland Reclamation Co.*, 842 F.2d 150, 154 (6th Cir.1988). In *Patton v. Aerojet Ordnance Co.*, 765 F.2d 604 (6th Cir.1985), this court held:

Dismissal of an action for failure to cooperate in discovery is a sanction of last resort that may be imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault.

*Id.* at 607 (citations omitted). The standard of review set forth in *Patton* was recently reexamined by this court in *Regional Refuse*, 842 F.2d at 154, wherein we stated that "if a party has the ability to comply with a discovery order and does not, dismissal is not an abuse of discretion." We further noted the Supreme Court has up-

held the use of dismissals as a sanction for failing to comply with discovery orders because it accomplishes the dual purposes of punishing the offending party and deterring similar misconduct by future litigants. *Regional Refuse Systems*, 842 F.2d at 154 (citing *National Hockey League*, 427 U.S. at 642–43, 96 S.Ct. at 2780–81)).

Among the factors to be considered in reviewing the imposition of sanctions for an abuse of discretion, the appellate court should consider: (1) whether the adversary was prejudiced by the dismissed party's failure to cooperate in discovery, (2) whether the dismissed party was warned that failure to cooperate could lead to dismissal, and (3) whether less drastic sanctions were imposed or considered before dismissal was ordered. *Regional Refuse Systems*, 842 F.2d at 155.

As a threshold matter we note that, in the instant case, the district court did not directly resort to dismissal as a sanction under Rule 37 but, rather, simply struck the affidavit of the plaintiffs' expert witness as punishment for the plaintiffs' repeated failure to produce the witness for a deposition by defendants. Although this action eventually resulted in the court granting summary judgment for defendants, we nevertheless find the distinction important because it demonstrates that the sanction imposed by the court was directly related to the plaintiffs' misconduct.

Applying the factors set forth by this court in *Regional Refuse Systems*, we find that the district court did not abuse its discretion by striking the affidavit of the plaintiffs' expert witness as a sanction for discovery abuses under Rule 37(b)(2). First, it is clear that the defendants were materially prejudiced by the plaintiffs' repeated failure to make their expert available for deposition. Not only were the defendants forced to incur additional legal expenses in attempting to obtain the deposition, but also, as noted by the district court, the dilatory tactics of the plaintiffs effectively prevented the defendants from engaging in further discovery after the deposition because of the close proximity to the trial date.

Second, it is clear that the plaintiffs received ample warning that sanctions would be imposed in the event of further noncompliance. In its order of November 2, 1987, the district court noted that defendants had already moved for sanctions against plaintiffs on three separate occasions, and that the defendants had requested that Dr. Feinberg's affidavit be stricken from the record. The court declined to strike Dr. Feinberg's affidavit at that time, due to the "potential effect on plaintiffs' ability to present a case in this action." The court did, however, assess costs against plaintiffs to compensate defendants for bringing the motion. Moreover, the court also gave plaintiffs an explicit warning that dire consequences would follow any further abuses. Given the procedural history of this case and the explicit warning contained in the court's November 2 opinion and order, we find that the plaintiffs had ample warning that sanctions would be imposed in the event of further noncompliance.

Third, it is clear from the record that the court's use of sanctions was measured, gradual, and in proportion to the plaintiffs' misconduct. As previously noted, the final sanction imposed was the striking of the affidavit by the plaintiffs' expert witness; thus, the court did not resort to outright dismissal as a sanction. Moreover, the court had previously imposed the lesser sanction of costs against plaintiffs and warned them that further sanctions would be imposed in the event of future noncompliance.

Another factor to be considered is the "willfulness" of the offending party's failure to comply with the court's discovery order. In the instant case, the October 16 letter from the plaintiffs' expert witness to the plaintiffs' counsel clearly states that the expert was available on several dates during the period specified in the court's order. Nevertheless, the plaintiffs' counsel failed to arrange a deposition on any of those dates. Instead, plaintiffs' counsel represented to the opposing parties and to the court that Dr. Feinberg would not be available for deposition until December 10, 11, or 14—well beyond the November 30

deadline established by the district court. This court has previously noted that the burden of proof is on the dismissed party to establish "that the failure to comply [with the discovery order] was due to inability, and not to willfulness, bad faith or any fault of the party." *Regional Refuse Systems*, 842 F.2d at 154 (quoting *Adkins v. United States*, 816 F.2d 1580, 1582 (Fed. Cir.1987)). In light of the letter from Dr. Feinberg to plaintiffs' counsel, it is clear that plaintiffs had the ability to comply with the district court's discovery orders, but failed to do so. Accordingly, we find that the district court did not abuse its discretion by striking the affidavit of plaintiffs' expert witness from the record as a sanction for the plaintiffs' failure to make the expert available for deposition in accordance with the district court's discovery orders of October 1, October 7, and November 2, 1987.

### III.

■ We now consider the district court's grant of summary judgment in favor of defendant Medtronics. The Supreme Court has described the standard for granting summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.... The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Court further explained that "[t]he burden on the moving party may be discharged by showing—that is pointing out to the district court—that there is an *absence* of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

In the instant case, the district court had previously denied a summary judgment motion by defendant Medtronics because the court found that "Dr. Feinberg's report raises triable issues of fact." After subsequently striking Dr. Feinberg's affidavit as a sanction for noncompliance with the court's discovery orders, the court found that there was no longer a genuine issue of material fact because the opinions of the defense experts stood unrebutted. We agree.

The defendant's motions for summary judgment were supported by the deposition testimony of Dr. Davis, the surgeon who performed the operation on Jessica Taylor, and the affidavit of Dr. Robert G. Hauser, a nationally recognized expert in the fields of cardiology and pacemaker implantation. Both Dr. Davis and Dr. Hauser stated that the lead-tissue interface anomaly with heart tissue is a known and unavoidable complication in a certain number of cases of pacemaker implantations. The risk is especially high in surgeries involving younger children; therefore, Dr. Davis testified that it was his common practice to attach two leads to the heart during the initial operation so that in the event that a lead-tissue interface anomaly developed on one of the leads, the other lead could still be utilized thereby avoiding the necessity of reopening the patient's chest cavity. Moreover, Dr. Davis testified that Medtronics' literature adequately defined and warned of these various unavoidable risks and that he explained these risks to the Taylors prior to the first implantation.

Plaintiffs contend there is still enough evidence in the record to create a genuine issue of material fact, even in the absence of Dr. Feinberg's expert testimony. In particular, plaintiffs rely on several miscellaneous government documents and news reports which described potential defects in another type of Medtronics' lead wire. Specifically, plaintiffs cite to reports regarding defects arising in the Model 6972 lead manufactured by Medtronics. According to plaintiffs, this type of lead was recalled after it was discovered that Model 6972 leads were susceptible to deterioration both in the insulation and the wiring itself.

988

In response to this argument, defendants point out that the Model 6972 which was the subject of the reports was a completely different design from the Model 4951 leads which were implanted in Jessica Taylor. The Model 6972 lead is a bipolar (two wires) endocardial lead; that is, it is inserted through the veins directly into the heart, whereas the Model 4951 lead is not inserted through the blood vessels but is attached to the outside surface of the heart. Thus, the Model 4951 unipolar epicardial lead is not subject to the same conditions which have lead to problems with the Model 6972 lead. Moreover, defendants argue that even if plaintiffs could show that the leads were substantially similar, it would not negate the fact that Dr. Davis tested the specific leads which were implanted in Jessica Taylor's body and found that they were still intact with no breakage in either the insulation or the wire itself. Thus, even if the documentary evidence put forth by plaintiffs could be interpreted to show a high incidence of defects in the Model 4951 leads, the evidence still demonstrates that the leads in this case were not defective.

In its opinion and order denying the plaintiffs' motion for reconsideration, the district court specifically noted that it had reviewed all the documents and exhibits and the record and still found that they were insufficient to create a jury question. Based on our review of the record, we agree with the district court that there was no genuine issue of material fact with respect to the question of whether the leads implanted in the heart of Jessica Taylor were defective. Accordingly, we find that defendant Medtronics, the manufacturer of the leads, was entitled to judgment as a matter of law.

For the foregoing reasons, the judgment of the district court is AFFIRMED.