958 F.2d 372
 58 Fair Empl.Prac.Cas. (BNA) 528, 73 Ed. Law
Rep. 617,
2 A.D. Cases 172
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Betty Jo PENDLETON, Plaintiff-Appellant,
v.
JEFFERSON LOCAL SCHOOL DISTRICT BOARD OF EDUCATION and
Principal Donald Schiff, Defendants-Appellees.
 No. 91-3126.
 United States Court of Appeals, Sixth Circuit.
 March 25, 1992.
 
 Before RALPH B. GUY, Jr. and BOGGS, Circuit Judges, and HARVEY, Senior District Judge.*
 PER CURIAM.
 
 
 1
 This is a handicap discrimination suit under brought under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and under 42 U.S.C. § 1983, by Betty Jo Pendleton against her employer Jefferson Local School District Board of Education and Donald Schiff, the principal of Memorial Middle School. The district court dismissed appellant's discrimination claims on summary judgment and appellant now appeals. We reverse in part and affirm in part.
 
 
 2
 * Pendleton, who is 49 and suffers from multiple sclerosis ("MS"), was an eighth grade mathematics teacher for 21 years in the Memorial Middle School. On August 25, 1987, she applied for disability retirement, which was approved by the Board, and she did not return to teaching in the fall of 1987 and currently remains on disability leave. Pendleton claims that she was forced to retire by the harassment and discriminatory treatment of Principal Schiff, which caused her MS to worsen to the point where she was no longer capable of working. She further contends that but for this discriminatory treatment she would have been able to continue working.
 
 
 3
 Pendleton was diagnosed with MS, a progressive auto-immune disease, in 1964 and the appellees knew that Pendleton had MS when the Board hired her. The course of events that led to her requesting disability leave began in early 1987 when she returned to work following recuperation from a cracked pelvic bone that she had sustained on December 21, 1986. On April 20, 1987, Schiff, without Pendleton's knowledge or permission, called her doctor, Dr. Martin Markus, purportedly to inquire about her MS. Schiff felt that Pendleton had been acting oddly lately and was "out of character." He pointed to only three instances during the past year that he considered indicative of this behavior: 1) a complaint from one parent about Pendleton's insensitive treatment of her child's weight (no other parents or teachers had ever filed any complaints against Pendleton); 2) a conversation with the high school principal, David Holland, who had a son in her class and who wanted to know why she was acting "so strange or different" this particular year; and 3) an incident in the spring of 1986 where Pendleton reported seeing a burning barn on her way to school, an incident that nobody in the school office could get confirmed by the police (although there was a barn fire in the area in February or March 1986).
 
 
 4
 Unless otherwise noted, the following facts are presented in a light most favorable to the plaintiff. Schiff testified that Dr. Markus told him Pendleton could be suffering from a drug-induced mental condition brought on by the long-term use of prescribed cortisone medication, but Pendleton testified that she had never used cortisone for the treatment of MS. Schiff also called Pendleton's husband, unbeknownst to Pendleton, to talk about her mental condition and how she should be cut back in teaching time and that he "wanted her out of the system." Schiff said he was receiving" ... pressure from the superintendent as well as parents and must act quickly." Schiff claims he was calling John Pendleton, a fellow educator and friend, out of concern for his wife's well-being.
 
 
 5
 On April 21, 1987, Schiff and Pendleton met in Schiff's office. Pendleton claims Schiff told her that she was suffering from "a psychosis caused by her medicine." Schiff testified he never used the word psychosis, although in later testimony he stated that he thought that her report of the barn burning was evidence of her "psychosis." Schiff told Pendleton she could not teach eighth grade mathematics because he thought it would be too stressful and that, at most, she would be permitted to teach part-time in another subject.
 
 
 6
 At this time, Pendleton contacted her union representative, Michael Shanesy, for assistance and also had a neurological exam done by Dr. James M. Parker on May 11, 1987. Dr. Parker wrote to Schiff on May 12, stating "I would agree completely with Dr. Markus that she [Pendleton] is still physically, mentally, and emotionally able to continue her teaching position." Appellees contend that the fact they were willing to let Pendleton teach part-time indicates that they too thought she was capable of continuing teaching to some degree.
 
 
 7
 After a meeting between Schiff, Shanesy, and Pendleton on May 14, 1987, Schiff went to the Superintendent of Schools, William Stephan. On May 15, 1987, Schiff informed Pendleton that she would be teaching full time during the 1987-88 school year. On May 17, 1987, Pendleton fell at home and broke her leg and was unable to return to finish the end of the school year. Shanesy met again with Schiff on June 5, 1987, about Pendleton's teaching status and attested that comments made by Schiff and the Superintendent, who joined in the meeting, were hostile and indicated that if Pendleton tried to teach full-time in the fall they would make it very difficult for her.
 
 
 8
 Pendleton claims that Schiff began calling her every day, beginning in August 1987, to see if she would be returning to teach in the fall. Pendleton asked him to stop calling, that she was planning on returning, and would call him as soon as she heard definitively from her doctors that she could return. Schiff admits that he did call Pendleton, but not as frequently as Pendleton claims. Dr. Parker, aware of Schiff's allegations of psychosis and his telephone calls during the summer of 1987, and based on conversations with Pendleton, recommended that she apply for disability leave due to the effects Schiff's treatment was having on her MS. Pendleton applied for leave, received it, and has not returned.
 
 
 9
 The district court granted summary judgment for the appellees on the ground that Pendleton had no cause of action under 29 U.S.C. § 794 since she had "resigned" and had not been "terminated" from her employment. The district court also held that, while 42 U.S.C. § 1983 could be used to enforce 29 U.S.C. § 794, appellees did not violate § 1983 under a rational basis test. The district court also dismissed Pendleton's state law claims for intentional and negligent infliction of emotional distress as well as breach of contract, holding that, absent a viable federal law claim, it no longer had pendent jurisdiction over these state law claims. Finally, the district court held that plaintiff was not required to exhaust administrative remedies before bringing a § 794 action.
 
 II
 
 10
 * This court reviews summary judgment de novo and we use the same test as used by the district court. See EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). Under Rule 56(c), Fed.R.Civ.P., summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To be genuine, the dispute must concern evidence upon which "a reasonable jury could return a verdict for the nonmoving party." Ibid.
 
 
 11
 To meet this standard, the moving party need not support its motion with affidavits or other similar materials "negating " the opponent's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (original emphasis). "[T]he burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. It requires a determination of whether the party bearing the burden of proof has presented a jury question as to each element of its case. Celotex, 477 U.S. at 322; Taylor v. Medtronics, Inc., 861 F.2d 980, 987 (6th Cir.1988). In other words, the movant is challenging "the opposing party to 'put up or shut up' on a critical issue." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir.1989).
 
 
 12
 The test for summary judgment is the same as a directed verdict: "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. Accordingly, viewing the evidence in a light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.
 
 B
 
 13
 The first issue to determine is whether the district court applied the correct standard of law. Pendleton brought her claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, alleging that appellees discriminated against her on the basis of her handicap as manifested by a persistent pattern of harassment by Schiff. 29 U.S.C. § 794 provides
 
 
 14
 No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 15
 Relying on Reynolds v. Brock, 815 F.2d 571 (9th Cir.1987), the district court concluded that the appellant had not "terminated" her employment and she therefore stated no cause of action under § 794. Under Reynolds, the standard for proving wrongful termination under § 794 is:
 
 
 16
 To establish a prima facie case of wrongful termination under the Rehabilitation Act, [the plaintiff] must demonstrate both 1) that she is an "otherwise qualified handicapped individual" for purposes of the Act and 2) that she was terminated because of her handicap. If she can establish a prima facie case of wrongful termination, then the burden of producing evidence shifts to the defendant, who must demonstrate a legitimate nondiscriminatory reason for terminating her.
 
 
 17
 Reynolds, 815 F.2d at 574 (citations omitted).
 
 
 18
 Following Bishop v. Wood, 426 U.S. 341 (1976), which held that the determination of employment is decided by reference to state law, the district court held that under Ohio law Pendleton had not been constructively discharged and therefore did not meet her burden of establishing a prima facie case of wrongful termination under the Rehabilitation Act. See Kinney v. Department of Administrative Services, 14 Ohio App.3d 33 (1984).
 
 
 19
 While the district court correctly interpreted the termination standards of these two cases in holding that Pendleton was not "terminated," this is not a termination case. Therefore these termination cases are not applicable in this situation, which is an "exclusion from employment" case.
 
 
 20
 On its face, § 794 is not limited to wrongful termination suits. It broadly provides that "... no otherwise qualified individual with handicaps ... shall, solely by reason of her ... handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination...."
 
 
 21
 In Smith v. Barton, 914 F.2d 1330 (9th Cir.1990), cert. denied, 111 S.Ct. 2825 (1991), the following test was established for plaintiffs pursuing § 794 claims:
 
 
 22
 To prevail in a case brought under section 504, a plaintiff must show that the plaintiff is: (1) a handicapped person under the Act; (2) otherwise qualified for the position sought; (3) being excluded from the position solely by reason of plaintiff's handicap; and (4) seeking a position that exists as part of a program or activity receiving federal financial assistance.
 
 
 23
 Smith, 914 F.2d at 1338-39 (citations omitted). Pendleton's claim involves the language of item three: whether plaintiff was excluded because of her handicap. The term "exclusion" is broader than, and not limited to situations merely involving, an employee's "termination."
 
 
 24
 Yet, the district court's ruling, in effect, would have the restrictive result of making an employer who fires an employee because of a handicap liable, while leaving untouched an employer who harasses or otherwise engages in discriminatory conduct against a handicapped individual, which, as a direct result, causes further deterioration of a person's physical condition to the point where she can no longer work. This result would undermine the very purpose of § 794.
 
 
 25
 While this is not a Title VII discrimination case, Pendleton cites Title VII theories of constructive discharge and hostile working environment to support her § 794 claim. Appellees argue that these "issues" were not raised below and therefore can not be raised for the first time on appeal. Secondly, appellees object because appellant never alleged Title VII violations and appellant is currently on leave and has not been discharged. Constructive discharge analysis is, therefore, doubly inappropriate.
 
 
 26
 However, as appellees themselves note, this circuit and several others have applied Title VII theories in deciding § 794 cases. See Jasany v. U.S. Postal Service, 755 F.2d 1244 (6th Cir.1985); Doe v. New York Univ., 666 F.2d 761 (2nd Cir.1981); Prewitt v. United States Postal Service, 662 F.2d 292 (5th Cir.1981); Pushkin v. Regents of University of Colorado, 658 F.2d 1372 (10th Cir.1981); and Smith v. Barton, supra. Further, the Title VII employment discrimination test established under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and refined in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981), has been modified in handicapped discrimination cases as follows:
 
 
 27
 1) The plaintiff must establish a prima facie case by showing that he was an otherwise qualified handicapped person apart from his handicap, and was rejected under circumstances which gave rise to the inference that his rejection was based solely on his handicap;
 
 
 28
 2) Once plaintiff establishes his prima facie case, defendants have the burden of going forward and proving that plaintiff was not an otherwise qualified handicapped person, that is one who is able to meet all of the program's requirements in spite of his handicap, or that his rejection from the program was for reasons other than his handicap....
 
 
 29
 Jasany v. United States Postal Service, 755 F.2d 1244, 1250 n. 5 (6th Cir.1985), citing Pushkin v. Regents of University of Colorado, 658 F.2d at 1386-87 (emphasis in original).
 
 
 30
 Appellees agree that exclusion, to be a violation, must have occurred solely by reason of her handicap. However, they claim they never wanted to exclude Pendleton at all and even if they did exclude her, such exclusion was not based on her handicap. Rather, appellees felt appellant was not physically capable of teaching full time and that it was not in her best interest to do so. However, a mere assertion that such action is in the "best interest" of a person with a handicap cannot avoid liability if the "best interest" is based on the person's handicapped status.
 
 
 31
 The standard of proof for constructive discharge under Title VII is that
 
 
 32
 "the constructive discharge issue depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." This court has also endorsed the well recognized rule in labor relations that a man is held to intend the foreseeable consequences of his conduct. Therefore, an employee can establish a constructive discharge claim by showing that a reasonable employer would have foreseen that a reasonable employee (or this employee, if facts peculiar to her are known) would feel constructively discharged.
 
 
 33
 Wheeler v. Southland Corp., 875 F.2d 1246, 1249 (6th Cir.1989) (citations and footnote omitted). Pendleton argues that she met this standard of proof, given that her employer knew the facts peculiar to her.
 
 
 34
 Pendleton presents a similar story under the hostile working environment theory of Title VII, which states that
 
 
 35
 "harassment [that is] sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment',' " is actionable under Title VII because it "affects a 'term, condition, or privilege' of employment"....
 
 
 36
 Patterson v. McLean Credit Union, 491 U.S. 164, 180 (1989) (citations omitted).
 
 
 37
 Pendleton contends that there are genuine issues of material fact that preclude summary judgment and require submission to the jury on this theory: a reasonable jury could conclude that Schiff became convinced in April 1987 that appellant was no longer physically or mentally capable of teaching; a reasonable jury could conclude Schiff acted on these convictions; and a reasonable jury could conclude that appellant was constructively forced from her position.
 
 
 38
 We agree with Pendleton that the district court should not have dismissed this action under § 794. The language of § 794 allows for handicap discrimination cases to be brought not only for "termination" but for "exclusion from employment." Under summary judgment standards of review, there are genuine issues of material fact that should be submitted to the jury as to whether Pendleton was discriminated against because of her handicap. If actions taken because of her handicap foreseeably led to a deterioration of her condition, thus causing her disability leave, then she may have been excluded from employment or constructively discharged on account of her handicap.
 
 C
 
 39
 A second issue raised on appeal is whether 29 U.S.C. § 794 requires exhaustion of administrative remedies prior to bringing a civil action in court. We agree with the district court's holding that the Rehabilitation Act does not require exhaustion of administrative remedies before bringing a civil action.
 
 
 40
 Section 29 U.S.C. § 794a(a)(2) sets forth the remedies for alleged violations of Section 794:
 
 
 41
 The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.
 
 
 42
 Section 794 explicitly entitles claimants to seek remedies under Title VI. In Neighborhood Action Coalition v. Canton, 882 F.2d 1012, 1015 (6th Cir.1989), we held that there is no requirement for Title VI litigants to exhaust administrative remedies prior to filing suit. Five other circuits, noting that the administrative remedies available under § 794 are those set forth under Title VI, have similarly rejected exhaustion requirements. See NAACP v. Medical Center, Inc., 599 F.2d 1247 (3rd Cir.1979); Camenisch v. University of Texas, 616 F.2d 127 (5th Cir.1980); Adashunas v. Negley, 626 F.2d 600 (7th Cir.1980); Meiner v. Missouri, 673 F.2d 969 (8th Cir.), cert. denied, 459 U.S. 909 (1982); and Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern California, 719 F.2d 1017 (9th Cir.1983).
 
 
 43
 Appellees argue that plaintiff should have first brought her claims to the Ohio Civil Rights Commission. However, as appellant points out, she was not filing a state law claim for handicap discrimination and there is no federal requirement for her to exhaust state administrative remedies prior to filing suit. Appellees rely heavily on Smith v. United States Postal Service, 742 F.2d 257 (6th Cir.1984), for their exhaustion requirement. However, that was a federal employee case, whereas this case involves an institution which receives federal aid.
 
 
 44
 The only possible administrative remedies available to Pendleton arguably would be those set forth by the Department of Education (DOE) in 34 C.F.R. § 104.1 et seq. Under these regulations, the only remedy appellant could have achieved would have been for the DOE to terminate federal assistance to the Jefferson School District. Yet, even with such drastic action, Pendleton herself would have received no relief.
 
 D
 
 45
 Also on appeal is whether 29 U.S.C. § 794 precludes plaintiff from bringing additional claims under 42 U.S.C. § 1983. The district court held that Pendleton had a cause of action under 42 U.S.C. § 1983, but held there were no issues of material fact and granted summary judgment for the defendants. Appellees claim that the trial court erred in holding that the plaintiff had a cause of action, while appellant contests the summary judgment ruling.
 
 
 46
 Section 1983 actions are authorized to enforce the provisions of federal statutes, Maine v. Thiboutot, 448 U.S. 1 (1980), unless a federal statute has a statutory remedial scheme that is so comprehensive as to leave no room for additional causes of action under § 1983. Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 20 (1981).
 
 
 47
 The district court held that in order to overcome the presumption that § 1983 can be used to enforce § 794, the defendant must demonstrate "by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." Wright v. Roanoke Redev. & Housing Auth., 479 U.S. 418, 423 (1986). The district court found that § 794 does not explicitly state that its remedies supplant § 1983 remedies.
 
 
 48
 However, Smith v. Barton states that it is a matter of disagreement whether the remedial structure of the Rehabilitation Act demonstrates congressional intent to preclude any § 1983 claims that could be brought under § 794. Smith, 914 F.2d at 1334. Since there is no indication that Congress intended to foreclose § 1983 claims that are unrelated to handicap discrimination, the Ninth Circuit in Smith held that § 794 should not act as a barrier to § 1983 claims based on violations of first amendment rights. Smith, 914 F.2d at 1335.
 
 
 49
 At least two lower courts have directly addressed this issue and permitted claims under both § 1983 and the Rehabilitation Act. See Rothschild v. Grottenthaler, 716 F.Supp. 796, 801 (S.D.N.Y.1989) (Rehabilitation Act held not to be so comprehensive as to leave no room for private remedies under section 1983), later proceeding, 725 F.Supp. 776 (S.D.N.Y.1989); Shuttleworth v. Broward County, 639 F.Supp. 654, 659-60 (S.D.Fla.1986) (Rehabilitation Act held not to preclude § 1983 action, with court noting reluctance of Supreme Court to infer congressional intent to preclude reliance on § 1983). Cf Alexander v. Chicago Park Dist. 773 F.2d 850, 855-56 (7th Cir.1985) (Title VII and Title VI only preclude actions under § 1983 that are "based on" those titles; "only if right asserted was created by Title VII must it be vindicated through the procedural system set up in that Act"), cert. denied, 475 U.S. 1095 (1986).
 
 
 50
 On the other hand, Tyus v. Ohio Dept. of Youth Services, 606 F.Supp. 239 (S.D.Ohio 1985), which the district court explicitly refused to adopt, held that the Rehabilitation Act did preclude § 1983 claims. The Tyus court, in finding that the Rehabilitation Act had administrative exhaustion requirements and that § 1983 allowed plaintiffs to circumvent these requirements, reasoned that the Rehabilitation Act was a broad mandate prohibiting discrimination on the basis of handicap and that § 1983 due process and equal protection claims would be encompassed within this mandate. However, we refuse to adopt this reasoning, as we hold that § 794 does not have exhaustion requirements. Thus, there is no reason to hold that the Rehabilitation Act and § 1983 actions are mutually exclusive remedies.
 
 E
 
 51
 Pendleton, in her § 1983 claim, alleges that Schiff's actions denied her right to equal protection of the law under the fourteenth amendment. To state a claim under 42 U.S.C. § 1983, Pendleton must show two things: 1) that the defendant acted under color of state law, and 2) that the defendant deprived the plaintiff of a federal right, either statutory or constitutional. Bacon v. Patera, 772 F.2d 259, 263 (6th Cir.1985), citing Gomez v. Toledo, 446 U.S. 635, 640 (1980). There is no dispute that Schiff, as an official of the public schools, was acting under color of state law. However, there is a question as to whether or not Schiff denied Pendleton a federal right.
 
 
 52
 The district court held that Pendleton's § 1983 action failed, as she had no colorable equal protection claim. The court held that under City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 445-46 (1985), and its progeny, people with handicaps do not constitute a suspect class protected by the exacting "strict scrutiny' standard of judicial review. Thus, actions affecting people with handicaps are subject to the most deferential level of review, the "rational basis" standard. Under this test, in order for the defendant's actions concerning Pendleton to withstand equal protection review, they need only be "rationally related to a legitimate governmental purpose." Lussier v. Dugger, 904 F.2d 661, 671 (11th Cir.1990).
 
 
 53
 While we agree with the district court's denial of Pendleton's § 1983 claim, we note some confusion over the application of an equal protection claim in this case. Typically, equal protection actions apply to legislative enactments: whether legislation denies a plaintiff equal protection under the laws. Pendleton was bringing an equal protection claim against a state agency, the public schools, for the action of a state official, Principal Schiff, not explicitly pursuant to any rule or legislation.
 
 
 54
 Under Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), and progeny, municipal bodies are not immune from § 1983 actions, but a municipal entity cannot be held liable solely on a respondeat superior theory. Id. at 690-91. To maintain such a § 1983 action, a plaintiff must demonstrate that the municipality maintained a policy, practice, or custom, formally or informally, that denied plaintiff equal protection of the laws. Doe v. McFaul, 599 F.Supp. 1421, 1436 (E.D.Ohio 1984). Pendleton provides no such evidence.
 
 
 55
 Pendleton's equal protection claim against Principal Schiff personally arises from the principal's administrative actions, the type of claim most typically recognized in law enforcement cases. See Bartalone v. County of Berrien, 643 F.Supp. 574, 576-77 (W.D.Mich.1986). The liability of state officials under § 1983 "is premised on the notion that § 1983 liability 'may be imposed both for action that deprives a plaintiff of a constitutional right and for failure to act, when there is a duty to act, to prevent such a deprivation.' " Doe, 599 F.Supp. at 1434-35 (citations omitted).
 
 
 56
 Our circuit has not taken a position on the use of equal protection analysis under section 1983 to challenge a simple bureaucratic action. As Judge Guy points out, equal protection is generally stated as applying to legislative or rule-based actions, which is not the case here. In this case it is not necessary to determine whether we would recognize this cause of action.
 
 
 57
 Even assuming that we would recognize such an action, the district court was correct when it held that Schiff's actions were "rationally related" to a legitimate governmental purpose." Lussier v. Dugger, 904 F.2d at 671. The defendant's explanation for his actions can withstand equal protection scrutiny based on his stated concern for the health of the plaintiff, and his administrative responsibility of finding a replacement if necessary. Pendleton has provided no evidence to refute this holding under the "rational basis" standard. See United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 174-75 (1980); New Orleans v. Dukes, 427 U.S. 297, 303 (1976); and Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483 (1955).
 
 
 58
 For all the above reasons, we REVERSE and REMAND in part and AFFIRM in part. We hold that summary judgment should not have been granted against plaintiff's action under 29 U.S.C. § 794 and that the district court should proceed accordingly. Since a viable federal claim does exist under § 794, the district court has pendent jurisdiction over the plaintiff's state law claims. However, we agree with the district court that the plaintiff may not pursue a cause of action under § 1983.
 
 
 59
 RALPH B. GUY, Jr., Circuit Judge, concurring.
 
 
 60
 I concur in the result and in the court's analysis of Pendleton's Rehabilitation Act claim. I write separately because I would affirm the dismissal of the Equal Protection Clause claim on a different ground than that relied upon by the court.
 
 
 61
 The court holds that Schiff had a rational basis to act as he allegedly did against Pendleton. I believe it is unnecessary to examine Schiff's motives, however, because Pendleton has failed to state an equal protection claim. "Equal protection deals with legislative line drawing; procedural due process deals with the adjudication of individual claims." 2 RONALD D. ROTUNDA ET AL., TREATISE ON CONSTITUTIONAL LAW §§ 18.2 (1986). "The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises." Plyler v. Doe, 457 U.S. 202, 216 (1982).
 
 
 62
 Where individual action has been the subject of a successful equal protection challenge, the individual actor was enforcing a policy. Pendleton has not alleged that Schiff's actions were part of a broader policy of official discrimination against the handicapped. Cf. Monell v. Department of Social Services, 436 U.S. 658 (1978) (official policy of discrimination against pregnant workers). I am not aware of any case in which a court has entertained an equal protection challenge against a mid-level administrator acting in an individual capacity against a single individual in the absence of an official policy being implicated.
 
 
 
 *
 The Honorable James Harvey, Senior United States District Judge for the Eastern District of Michigan, sitting by designation